Gaines v. Green Pond Iron Mining Co.

---

MARQUIS D. L. GAINES et al.

*v.*

THE GREEN POND IRON MINING COMPANY et al.

1. The life tenant has a right to use a mine for his own profit where the owner of the fee, in his lifetime, opened it, even though he may have dis-continued work upon it for a long period of years. A mere cessation of work, for however long a period, will not defeat the life tenant's right, but an abandonment for a day, with an executed intention to devote the land to some other use, will be fatal to the claim of the life estate.

2. New shafts may be sunk upon veins of ore which had been opened.

---

On appeal from a decree of the chancellor, reported in *Gaines v. Green Pond Mining Co., 5 Stew. Eq. 86.*

*Mr. Barker Gummere,* for appellants.

Two main questions of fact arise upon the pleadings and proofs, to wit:

I. Is it proved that Charles Montrose Graham 3d and Cornelia Ludlow were lawfully married?

II. Is it proved that Robert Ludlow Graham, one of the complainants, is the lawful issue of that marriage?

Mr. Gummere discussed the evidence as to

(a) Courtship.

(b) The marriage.

(c) The certificate and registry.

(d) The situation after marriage.

III. Is Robert Ludlow, calling himself Graham, proved to be lawfully begotten by Charles M. Graham?

(a) Preparations for the birth.

(b) Alleged baptism of child.

(c) Recognition by family.

Long cohabitation between a man and woman, and repeated formal recognitions by them, are evidence of their marriage. *Wilson* v. *Hill, 2 Beas. 145.*

Long cohabitation and general reputation during the period of such cohabitation, are evidence of marriage. *Young* v. *Foster, 14 N. H. 114.*

But I deny that any case has ever held that where the parties have never cohabited, and the alleged husband, up to the time of his death, denied the alleged marriage, and where the husband's father also denied the marriage up to the time of the alleged husband's death, that the subsequent recognitions of such father are evidence of marriage.

IV. Alleged waste.

So long as the land is fairly used for the purposes to which it was dedicated by the ancestor or donor, no waste is committed. But when the use is one which is inconsistent with such dedication, it is waste, provided such use does a lasting damage to the freehold or inheritance, and tends to the permanent loss of the owner in fee, or to destroy or lessen the value of the inheritance. *1 Wash. Real Prop. *108,* and note 1; *Stoughton* v. *Leigh, 1 Taunt. 402, 409;* *Billings* v. *Taylor, 10 Pick. 460;* *Coates* v. *Cheever, 1 Cow. 460;* *Reed* v. *Reed, 1 C. E. Gr. 248;* *Bagot* v. *Bagot, 32 Beav. 509;* *Elias* v. *Snowdon Slate Co., L. R. (4 App. Cas.) 454.*

Gaines v. Green Pond Iron Mining Co.

In America, the law of waste has been modified to suit the circumstances of a new and growing country. *Finlay* v. *Smith, 6 Munf. 134; Neel* v. *Neel, 19 Pa. St. 323; Irwin* v. *Covode, 24 Pa. St. 162; Westmoreland Coal Co.'s Appeal, 85 Pa. St. 344.*

That the new opening, made by the Green Pond Iron Company, on the same vein opened by Dr. Graham, was not an opening of new mines, is too strongly fixed by authority to be questioned. When opened, the vein became a mine, and our new openings are workings of the same mine. *Findlay* v. *Smith, ubi supra; Elias* v. *Snowdon Slate Co., ubi supra; Croach* v. *Puryear, 1 Rand. 258; Clavering* v. *Clavering, 2 P. Wms. 388.*

*Mr. Henry C. Pitney*, for appellants.

I. As to the titles of the complainants.

(*a*) The burthen is on the complainants to show their title to the premises, and this depends, confessedly, on the legitimacy of Robert L. Graham.

(*b*) In making out his legitimacy, the kind of evidence which is ordinarily relied upon in such cases, viz., the cohabitation as man and wife of his mother and her alleged husband, and the acknowledgment of the marriage relation by the latter, is entirely lacking. There is no pretence of any such cohabitation or acknowledgment. On the contrary, the entire absence of it is affirmatively shown.

(*c*) The production of a marriage certificate, in which occurs the name of a person somewhat similar to that of the alleged husband, is of itself insufficient. The residence named in the certificate, being different from that of the alleged husband, destroys all value of the certificate as such, and increases the burthen of proving the identity of the alleged husband with the male person who went through the ceremony.

(*d*) There is not the least proof in the case of the identity of the alleged husband with the person who went through the ceremony, except that of the mother and the alleged wife. All that the clergyman proves is, that there was such a ceremony.

(*e*) The mother and alleged wife is shown to be entirely unworthy of credit, and is contradicted in several instances.

(*f*) The partial recognition of the legitimacy of the claimant by the grandmother and grandfather many years afterwards, when both had fallen into senility, is not sufficient to help out complainants' case. The rights of the true heir, Edward Ennis Graham, of North Carolina, the brother of Dr. Graham, who survived his grandnephew of the same name, cannot be defeated by such evidence.

II. There is no waste.

The facts are that the land in question is very rough and mountainous, with a very thin covering of wood and timber, almost all of it entirely unfit for cultivation, and on it is a very large deposit of iron ore, known for years as the "Copperas Mine."

The estate for life of Mrs. Bell resembles the estate by the curtesy of England, and it was always doubted whether, at the common law, and before the statutes of Marlbridge and Gloucester, tenant by the curtesy was impeachable for waste. *2 Coke Inst. 301 ; Bro. Abr., Waste, 88 ; 2 Christ. Black. 283*, note.

By the strict rule of the common law, the opening and working of an unopened mine, by a tenant for years, was undoubtedly waste.

The language everywhere used was "open" and "opened" to describe a mine which tenant for life might work. *7 Bac. Abr. 254; 1 Cruise 118; 2 Bouv. L. D. 645; Saunders's Case, 5 Coke R. 12; 1 Co. Litt. 54 b; Com. Dig. Waste, D. 4.*

Chancellor Kent (*4 Comm. 76*) says : "The American doctrine on the subject of waste is somewhat varied from the English law. and is more enlarged and better accommodated to the circumstances of a new and growing country."

And see the language of the judges in *Jackson* v. *Brownson, 7 Johns. 227 ; Hastings* v. *Crunckleton, 3 Yeates 261; 1 Scribner on Dower 200,* §§ *21–24 ;* Cabell, J., in *Findlay* v. *Smith, 6 Munf. 134; Ballentine* v. *Poyner, 2 Hayw. 110 ; Stoughton* v. *Leigh, 1 Taunt. 402 ; Coates* v. *Cheever, 1 Cow. 460 ; Neel* v. *Neel, 19 Pa. St. 323 ; Irwin* v. *Covode, 24 Pa. St. 162 ; Billings* v. *Taylor, 10 Pick. 460 ; Reed* v. *Reed, 1 C. E. Gr.*

Gaines *v.* Green Pond Iron Mining Co.

*248, 250; Viner* v. *Vaughan, 2 Beav. 466; Bagot* v. *Bagot, 32 Beav. 509, 9 Jur. (N. S.) 1022; Elias* v. *Griffith, L. R. (8 Ch. Div.) 521; S. C., sub nom. Elias* v. *Snowdon Slate Quarries, L. R. (4 App. Cas.) 454.*

The opinion of the court was delivered by

Van Syckel, J.

The bill in this cause was filed by the complainants as owners of the remainder in fee of a large tract of wild lands in the county of Morris, to restrain the defendants, who, it is alleged, have only a life estate in said lands, from cutting timber and working the iron mines on said premises, and also praying for an account.

Two principal questions are raised by the defendant's answer: First, whether Robert L. Graham, through whom the complainants derive their title, was the legitimate son of Charles M. Graham, the third.    Second, whether, if Robert's legitimacy is established, the working of the mines by the life tenants, under the circumstances shown in this case, is waste.

The complainants allege that Charles M. Graham was married clandestinely to Cornelia Ludlow in July, 1847, and they admit that it was not followed by open cohabitation.    Under such circumstances the law will cast upon the complainants the burden of proving the fact of marriage by very clear and persuasive evidence.

It is not deemed necessary to discuss the testimony on this branch of the case; it is sufficient to say that a careful consideration of it has left no doubt in my mind that the chancellor is justified in the conclusion he reached upon this point.

The complainants, therefore, as owners of the remainder in fee, are entitled to protect their estate against waste by the life tenant, or those claiming under her.

The land in question is very rough and mountainous, and almost all of it unfit for cultivation.    On it there is a thin covering of wood and timber, with a large deposit of valuable iron ore underlying it.    About the year 1812, Dr. Graham, then

owner of the fee, excavated the iron ore for the purpose of man-
ufacturing copperas, sulphur being combined with it in such
proportions as made it available for that purpose. He made at
least two openings, from ten to fifteen feet deep, out of which
the ore was raised, and carried on this business for several years.
There was erected upon the premises a building used for pound-
ing the ores, and other apparatus for treating them. There was
no digging for ore from the time Dr. Graham quit working
(about 1812 or 1814) until about forty years ago, when a small
quantity of ore was taken out and tested at two different forges
in the neighborhood, and was considered to be without value as
iron ore, on account of the sulphur it contained. From that
time there has been no mining upon these premises until the
Green Pond Iron Company commenced its operations in 1872.

By the strict rule of the common law, the opening and work-
ing of a mine by a tenant for years, not opened in the lifetime
of the previous tenant in fee, was, equally with the cutting of
timber, an undoubted waste of the estate. In *Hoby* v. *Hoby, 1
Vern. 218*, the widow was held to be dowable of a coal work.
It was resolved in *Saunders's Case, 5 Coke 12*, that if a man
hath land in part of which there is a coal mine open, and he
leases the land to one for life, or for years, the lessee may dig in
it, for inasmuch as the mine is open at the time, and he leases
all the land, it shall be intended that his intent is as general as
his lease."

The tenant for life, subject to waste, cannot open a new mine.
*Whitfield* v. *Bewitt, 2 P. Wms. 242*.

And if a lease of land be made, and some mines are open and
some not, the open mines only can be wrought. *Astry* v. *Ballard,
2 Lev. 185*.

But a tenant for life may open the earth in new places in pur-
suit of an old vein of coals, when the coal mine had been opened
before he came in possession of the estate. *Clavering* v. *Claver-
ing, 2 P. Wms. 388*.

*Stoughton* v. *Leigh, 1 Taunt. 402*, was a case directed out of
the high court of chancery for the opinion of the law judges.
The case involved the right of the widow to dower in certain

Gaines v. Green Pond Iron Mining Co.

mines on an estate of which her husband had died seized. The mine had been opened and wrought, but had ceased to be worked long prior to the husband's death. The question was whether the widow, in virtue of her estate in dower, was entitled to work the abandoned mine for her own benefit.

The judges answered that the widow was dowable of all the mines which had been opened and worked in her husband's lifetime, and "that her right to be endowed of them had no dependence upon the subsequent continuance or discontinuance of working them, either by the husband, in his lifetime, or by those claiming under him, since his death."

In *Viner* v. *Vaughan, 2 Beav. 466*, Lord Langdale said:

"A tenant for life has no right to take the substance of the estate by opening mines or clay-pits; but he has a right to continue the working of mines and clay-pits where the author of the gift has previously done it, and for this reason that the author of the gift has made them part of the profits of the land."

A temporary injunction was granted, so that the right of the life tenant to work the clay pits might be passed upon. That this case did not receive a thorough consideration, is shown by the fact that *Stoughton* v. *Leigh* was not referred to.

This subject was carefully considered by Lord Romilly, in *Bagot* v. *Bagot, 32 Beav. 509*, where he says:

"With respect to the abandoned, or, as they are called in the pleadings and evidence, the dormant mines, I am of opinion that it has not been shown that he committed waste in working those mines. It is always a question of degree to be established by evidence, whether the working of a mine which has been formerly worked, is waste or not. There is no doubt that a tenant for life, though impeachable for waste, may properly work an open mine. A mine not worked for twelve months, or two years, previously to the tenant for life coming into possession, must still be considered an open mine. A mine which has not been worked for one hundred years cannot, I think, be properly so treated. My present opinion is, that a mine which had not been worked for twenty or thirty years, from the loss of profit attending the working, might, without committing waste, be worked again by a succeeding tenant for life. But, if the working of the mine had been abandoned by the owner of the inheritance many years previously, with a view to some advantage which he considered would accompany such discontinuance, apart from the profits to be made from

39

the sale of the mineral, I doubt whether a succeeding tenant for life could properly treat that as an open mine."

In *Elias* v. *Griffith, L. R.*, *(4 App. Cas.) 465*, Lord Selborne says:

" Upon the questions of law which were argued at the bar, I think it unnecessary to make more than two remarks. The first is, that I am not at present prepared to hold that there can be no such thing as an open mine or quarry, which a tenant for life, or other owner of an estate impeachable for waste, may work, unless the produce of such mine or quarry has been previously carried to market and sold. No doubt if a mine or quarry has been worked for commercial profit, that must, ordinarily, be decisive of the right to continue working ; and, on the other hand, if minerals have been worked or used for some definite and restricted purpose (*e. g.*, for the purpose of fuel or repair to some particular tenements), that would not alone give any such right. But if there has been a working and use of minerals not limited to any special or restricted purpose, I find nothing in the older authorities to justify the introduction of sale as a necessary criterion of the difference between a mine or quarry which is, and one which is not, to be considered open in a legal sense. None of the *dicta* which are to be found in some of the more modern cases (each of which turned upon its own particular circumstances) can have been intended to introduce a condition or qualification not previously known, into the law of mines.

" The other observation which I desire to make is, that when a mine or quarry is once open, so that the owner of an estate impeachable for waste may work it, I do not consider that the sinking a new pit on the same vein, or breaking ground in a new place on the same rock, is necessarily the opening of a new mine or quarry ; and for this, authority is to be found in the cases which were cited at the bar, of Clavering *v.* Clavering, Bagot *v.* Bagot, and Lord Cowley *v.* Wellesley."

In *Elias* v. *Griffith, L. R. (8 Ch. Div.) 521*, Lord Cotton remarked that

" To enable a termor, or tenant for life punishable for waste, to work mines, it must be shown that the owner of the inheritance, or those acting by his authority, have commenced the working of the mines with a view to making a profit from the working and sale of what is part of the inheritance. When this is established, though no profit has in fact been made, the mine is open in such a sense as to justify the continuance of the working by a termor."

The case of *Clavering* v. *Clavering, 2 P. Wms. 388*, which recognizes the right of the life tenant to open new pits or shafts,

Gaines *v.* Green Pond Iron Mining Co.

for the working of an old vein of coal, has never been overruled in the English courts.

These citations show that, in England, the life tenant has a right to use a mine for his own profit, where the owner of the fee, in his lifetime has opened it, even though he may have discontinued working upon it for a long period of years.

The rule by which the right of the life tenant is to be tested is not the length of time that may have elapsed since the last working of the mines, but it depends upon whether the owner of the fee merely discontinued the work for want of capital, or because it did not prove profitable, or for any other like reason, or whether he ,abandoned it with an executed intention to devote the land to some other use.

A mere cessation of work, for however long a period, will not defeat the life tenant's right, but an abandonment for a day, with a view, in the language of Lord Romilly, "to some advantage to the property, which the fee owner considered would accompany such discontinuance, apart from the profits to be made from the sale of the mineral," would extinguish any claim on the part of the life tenant. If the fee owner should sink a shaft, and afterwards erect a dwelling-house over it, or if he should fill it up and devote the space to agricultural purposes, it would indicate, so clearly, his intention to devote his estate to other uses than mining, that the life tenant could not base any right upon the prior opening.

The distinction between mere cessation of use and such an abandonment as has been adverted to, is recognized in the cases in this country.

In the New York supreme court, a widow was held to be dowable of a bed of iron ore, although the openings which had been made by the husband had been partly filled up and the work discontinued in his lifetime. *Coates* v. *Cheever, 1 Cow. 460.*

Chief Justice Shaw, in *Billings* v. *Taylor, 10 Pick. 460,* expresses the like view:

"Whatever doubts may have been formerly entertained, it seems now to be well settled that a widow is entitled to dower in such mines and quarries as were actually opened and used during the lifetime of the husband, and it

makes no difference whether the husband continued to work them to the period of his death, or whether they have been continued since his death, by the heir or his assignee."

*Stoughton* v. *Leigh*, *Coates* v. *Cheever* and *Billings* v. *Taylor*, are cited with approbation by Chancellor Green, in *Reed* v. *Reed*, *1 C. E. Gr. 248*.

The American cases have modified the law of waste, to adapt it to the circumstances of a new and growing country, in order to encourage the tenant for life in making a reasonable use of wild and undeveloped lands. *Hastings* v. *Crunckleton, 3 Yeates 261*; *Findlay* v. *Smith, 6 Munf. 134*; *Ballentine* v. *Poyner, 2 Hayw. 110*; *Neel* v. *Neel, 7 Harris 323*; *Irwin* v. *Covode, 12 Harris 162*.

In *Neel* v. *Neel*, a coal mine had been opened and worked for family use, and for the benefit of the neighbors, but a very inconsiderable quantity had been taken out. In that case, Judge Lowrie said :

"It seems, in this case, that the author of the gift had sometimes sold coal out of the pits, but I do not conceive this to be material. It is sufficient that he opened them and derived any profit from them, even if it were only private. And the decisions refer to coal mines, iron mines &c., and the tenant for life may work them, even though the working of them may have been discontinued before the death of him through whom the estate comes, and, if necessary to the proper working of them, to make new openings in the ground."

In support of these views he cites the English and American cases, and expresses himself without reference to the statute of 1848.

Chancellor Kent says :

"The American doctrine on the subject of waste is somewhat varied from the English law, and is more enlarged and better accommodated to the circumstances of a new and growing country." *4 Comm. 76.*

The cases referred to will show a strong inclination to amplify the privileges of the life tenant.

In a country like this, where there are such vast bodies of unimproved lands, which would otherwise lie dormant in the

hands of the life tenant, public policy requires that the doctrine of waste should be liberalized, and the decisions have uniformly been in that direction.

The present case illustrates the hardship of a close rule in favor of the fee. The life estate vested in 1860, and there is an expectancy of twenty years more of this life. A construction of the law which locks up the land from all beneficial use for so long a period, and gives the life owner only the privilege of paying the land tax, should not be favored.

When the property is unimproved land, not adaptable to any other beneficial use than that of mining, the right of the life tenant to use it reasonably for such purpose, has some support in the adjudications in this country, and is certainly not without reason to uphold it.

To maintain the right of the appellant in this case, it is not necessary to broaden the rule to that extent.

The openings in this case were such as, under the English cases, will establish the right in the life estate to pursue the workings upon the veins which had been opened.

It is sufficient to show that openings were made and ore taken out with a view to profit, and it is wholly immaterial whether the ore was used in the manufacture of copperas or for some other commercial purpose.

The evidence shows a mere cessation of the work, not such an abandonment, in the legal sense of that term, as will defeat the right of the life tenant. The length of time during which cessation continued is immaterial, so long as the fact of abandonment is not established.

The decree of the chancellor, so far as it denies the right of the appellants to work the veins of ore upon which the openings had been made in the lifetime of the owner of the fee, and so far as it enjoins such work, should be reversed, and in other respects affirmed.

*Decree unanimously reversed.*