This bill is filed by the (substituted) trustees under the will of Sarah A. Hewitt for the directions of the court. Mrs. Hewitt died August 14th, 1912, leaving a will dated May 17th, 1905, and seven codicils thereto. Thereby she gave to certain trustees one-sixth of the residuary estate "in trust to enter into, upon and to take possession of the same, to invest, reinvest and keep invested, the same, to collect and receive the rent, income, issues and profits thereof, and to apply the same to the use of my son, Edward R. Hewitt, during his life." Then to the use of certain other persons for life, and finally "to convey and pay over" the one-sixth share to the final beneficiaries. The trustees named in the will and codicils have either passed away or resigned. Mr. Edward R. Hewitt, the life beneficiary, and Mr. Lightner were appointed substituted trustees in 1913 and 1920 respectively. They are the present trustees and the complainants in this cause. Their intermediate account for the period ending September 15th, 1923, has been approved by the Passaic county orphans court.
The first question presented in this suit concerns the division between corpus and income of dividends received on stock of the Union Sulphur Company. Mrs. Hewitt, in her lifetime, owned stock in this company; shortly before her death, she transferred to the Ringwood Company, a corporation, all of the capital stock which she owned. On May 8th, 1913, the then trustees under Mrs. Hewitt's will, received as a dividend from the Ringwood Company thirty shares of this stock of the Union Sulphur Company, and the stock of the Union Sulphur Company has ever since continued to be one of the most valuable assets of the trust estate. The story of the Union Sulphur Company is highly entertaining. It was organized in 1896 with a capital of $200,000 divided into two thousand shares of $100 each. Immediately *Page 301 
it purchased a sulphur mine for $265,000 and within twelve years inaugurated the policy of paying monthly dividends of one hundred per cent., or at the rate of twelve hundred per cent. per year. From that day to this, it has maintained these dividends with little variation. In the past twenty years, half a dozen monthly dividends have been omitted and on the other hand, there have been some twenty-five monthly dividends of one hundred and fifty per cent. or even two hundred per cent.
Balance sheets of the company shortly before and shortly after Mrs. Hewitt's death, have been put in evidence and counsel calculate from them that the surplus of the company, according to its books of account, was $6,554,205 on the day of her death. By March 1st, 1913, the surplus had increased by $1,111,175 to $7,665,380. On December 31st, 1929, the surplus stood at $19,695,244. From these figures it is contended on behalf of the life tenant that all of the dividends have been declared out of earnings made since the death of testatrix and that despite the size of these dividends, the net assets of the company have increased $13,000,000. But it further appears that in 1917 the management of the company, having especially in mind the federal income tax, increased the value of their mine on the books of the company as of March 1st, 1913, by $16,838,423 and increased the amount of surplus as of the same date by a like figure. Until this change was made, the sulphur mine stood on the books at $265,000.
If the action of the company taken in 1917 be accepted as reflecting the true condition of the property March 1st, 1913, and it be further accepted that the surplus, from the death of Mrs. Hewitt until March 1st, 1913, increased only $1,111,175, then it is immediately apparent that between the death of testatrix and December 31st, 1929, the surplus has been depleted $3,697,384 or at the rate of $1,848.69 for each of the two thousand shares of capital stock outstanding. If this method of calculation be followed, then, of the dividends received by the trustees and their predecessors, $55,460.76 represents a distribution of surplus accumulated prior to Mrs. Hewitt's death. *Page 302 
In my opinion, this court must accept as true that the sulphur company had a surplus of $24,500,000 March 1st, 1913. The action of the management in readjusting its books was presumably correct. Ballantine v. Young, 79 N.J. Eq. 70. No evidence is presented to the contrary, although it is suggested that their action is not entitled to weight, since it was taken with a view to its effect on the income tax of the company and its stockholders. Counsel for the life tenant does not press this suggestion to a conclusion, namely, that the company did not have the surplus which its management caused to be shown on its books and that they changed the books with intent to defraud the government. I cannot assume this view of their action. Furthermore, the size of the dividends indicates that the mine of the company was worth many times the figure of $265,000, which was its book value until the directors in 1917 altered the figure. A mine worth only $265,000 does not, year after year, yield an income which will permit annual dividends of $2,400,000 and, in addition, the accumulation of a surplus of $19,000,000. Nor can I consider that the increase in value of the mine occurred between the death of testatrix August 14th, 1912, and March 1st, 1913. Dividends of twelve hundred per cent. annually had been declared for several years before her death, thus showing that the value of the mine had already been established before she passed away. I find that, of the dividends on the thirty shares of stock since Mrs. Hewitt's death, $55,460.76 were made out of surplus accumulated in her lifetime.
Every case relating to the distribution of dividends between life tenants and remaindermen involves a reference to Lang v.Lang's Ex'rs, 57 N.J. Eq. 325. Mr. Justice Collins began his opinion with this sentence: "The underlying principle applicable in this case is that no corporate dividend declared after the right to income has become severed from the ultimate ownership of the stock upon which such dividend is declared, belongs in equity to the person entitled to income except so far as it is derived from the earnings of the stock after such severance." Counsel for the life tenant contends, *Page 303 
however, that this rule is not applicable to ordinary cash dividends, and further, that the dividends of the Union Sulphur Company received by the trustees, are ordinary dividends and therefore belong to the life tenant even though made out of surplus accumulated before the death of Mrs. Hewitt. InBallantine v. Young, supra, Vice-Chancellor Stevens said: "Ordinary cash dividends go, of course, to the life tenant." InMcCracken v. Gulick, 92 N.J. Eq. 214, Mr. Justice Swayze wrote: "The fundamental principle is to carry out the intent of the testator. Clearly, when he has created a trust fund and directed that the income be paid a beneficiary for life, he intends to secure that income to the life tenant; that is the very object of the fund. Where specific stocks may, pursuant to the will or the statute regulating investments for a trust fund, be retained by the trustee, it is a fair inference that the testator meant the life tenant to have the ordinary annual income of these stocks within the limits of variation permitted to the judgment of the directors." In neither of these cases, however, were ordinary dividends the subject of the action of the court; the reference to "specific stocks" in the latter case should not be overlooked. Dictum that there is no distinction, as to apportionment, between extraordinary and ordinary dividends may be found in the Lang Case and in Brown v. Brown, 72 N.J. Eq. 667, andBeattie v. Gedney, 99 N.J. Eq. 207. In Lister v.Weeks, 60 N.J. Eq. 215; affirmed, 61 N.J. Eq. 675, the testator owned stock on which annual dividends of fifteen per cent. had been declared for several years prior to his death. Eight months after his decease, such an annual dividend was declared and paid to his executor. Part of this dividend was made out of surplus accumulated before his death. The whole dividend was paid over by the executor to the life tenant. This was held to have been a breach of trust. Vice-Chancellor Buchanan, in Hagedorn v.Arens, 106 N.J. Eq. 377, applied to ordinary cash dividends the rule of apportionment laid down in the Lang Case.
The contention that the dividends of the Union Sulphur Company should not be apportioned for the reason that they *Page 304 
were ordinary dividends, cannot prevail. Counsel say further that a company such as the Union Sulphur Company, whose principal asset is a mine or other wasting asset, is not under a duty to its stockholders to set up a depletion reserve in order to keep its surplus intact; that the net earnings of the company, without any charge for depletion, constitute its income and that dividends declared out of such income belong to the life tenant despite the depletion of the mine. Counsel also point out that the Union Sulphur Company, during the lifetime of Mrs. Hewitt, did not deduct depletion from earnings and that Mrs. Hewitt treated the entire dividends on that stock as income.
As between the corporation and its stockholders, the weight of authority permits the directors to declare dividends out of the annual earnings of a mine without regard to depletion. Mellon
v. Mississippi Wire Glass Co., 77 N.J. Eq. 498. But the question now before the court does not deal with the rights of stockholders as against the corporation and so the rules relating to the power of directors to make dividends are not so much assistance in guiding the court in the present case. Nor do I think that the fact that Mrs. Hewitt in her lifetime treated these dividends as income, is of much pertinence. I might also add that I do not find any evidence as to how she treated these dividends. I may also note that the company in 1917 actually began to charge net earnings with depletion at the rate of $2.80 per ton of sulphur sold. About 1924, the mine was actually exhausted. In the meantime, however, large reserves had been built up and invested in income-bearing securities; also, oil was discovered on the land of the company. Since the exhaustion of the mine, dividends have been paid out of other income of the company and out of the reserve which was accumulated before the exhaustion of the mine.
The general rule urged by counsel finds support in one New Jersey case. Mulford v. Mulford, 42 N.J. Eq. 68. Testator had devised the residue of his estate to executors to pay the income to certain persons for life and then to distribute the corpus.
Part of the estate was a stone quarry. Chancellor *Page 305 
Runyon said: "The proceeds of the sale of building stone taken by the executor from quarries upon the testator's land which were opened before his death and never abandoned, is part of such income. Gaines v. Green Pond Iron Mining Co., 33 N.J. Eq. 603." The chancellor did not consider the question of depletion or whether the proceeds of the quarry should be apportioned in order to keep intact the corpus of the estate. The GainesCase, referred to by him, was a bill to restrain waste. A certain minor had died seized of land, leaving a mother and more distant relatives. Under the statute of descent, the mother took a life estate and the other heirs, the remainder. Grantees of the life tenant began to work an old iron mine. The court decided, principally on the analogy of dower and curtesy, that the life tenant had the right to work the mine for her own profit. It will be noticed that the question in that case was the right of a life tenant by operation of law, while in the present case the determining factor is the intent of the testatrix.
In Helme v. Strater, 52 N.J. Eq. 591, testator owned nearly the entire capital stock of a certain company. He agreed to give one-third of this stock to his son and one-third to his son-in-law over a period of years, that is, each one would receive a few shares each year until he held one-third of the stock. Shortly after making this agreement, the testator died, leaving a will whereby he directed his executor to carry into effect the agreement, bequeathed outright his remaining one-third of the stock and gave the residue of his estate, including the two-thirds of the stock which were subject to this agreement, to his executors in trust to pay the income to one beneficiary for life and eventually to turn over the corpus to another. As a result of the arrangement testator had made, the two-thirds of the stock which came into the hands of his trustees, would eventually cease to be a part of his estate. Chancellor McGill stated the general rule: "Where a testator bequeaths the residue of his property without specific description or in other words indicating an intention that it shall be enjoyed in specie, first to a tenant for life and then to a remainderman, and thus manifests that *Page 306 
the same fund shall be successively enjoyed by both, the necessary inference and established rule in equity are that it must be invested as a permanent fund so that the successive takers shall enjoy it in an equally productive capacity. But where it consists in whole or in part of property which is in its nature perishable, which for some reason cannot be converted into money or cannot be so converted without sacrifice of both principal and interest, the tenant for life will not be entitled to the annual product which the property thus perishing is actually making but to interest from the testator's death on the value thereof estimated as of that time. * * * The reason of this rule is the just consideration that the testator has the interest of the successive takers equally in view and intends that there shall be equality in their respective enjoyments." He decided that as each dividend on the stock was received, the executors should calculate a sum which, if received at testator's death, would, with compound interest, amount to the dividend and that such sum should be considered as principal and the balance of the dividend as income.
The Helme Case was relied on by Vice-Chancellor Stevens in the first suit of Ballantine v. Young, 74 N.J. Eq. 572;affirmed, 76 N.J. Eq. 613. He there held that when bonds had been purchased by trustees at a premium, there should be deducted from each interest payment a sum sufficient to make up at the maturity of the bond the amount of the premium so that thecorpus might remain intact. He said that this rule "will in the majority of cases better effectuate the intent of the testator and better harmonize with the rule established in the somewhat analogous case of perishable or wasting property given to legatees in succession."
The fundamental ground for the apportionment of dividends is the preservation intact of the corpus. The preservation of thecorpus is equally important to the remaindermen whether the estate is invested in mining stock or railroad securities. When the books of the corporation whose stock the trustees hold, show, as here, that the dividends have been paid in part out of surplus accumulated before the death of testatrix, I think the dividends must be apportioned. *Page 307 
It has also been noted that from the death of the testatrix until May 8th, 1913, the Union Sulphur Company's stock was held by the Ringwood Company. It may be that part of the distribution of surplus since Mrs. Hewitt's death was paid to the Ringwood Company and not to the trustees under her will. No balance sheet is presented as of May 8th, 1913. One is presented, however, as of March 1st, 1913, from which it appears that the surplus largely increased between Mrs. Hewitt's death and that date. No dividends out of surplus were therefore received by the Ringwood Company unless between March 1st and May 8th, 1913. The dividends during this period of two months and eight days were less than one per cent. of the total dividends which have accomplished the depletion of the surplus. The credit which could be given to the life tenant on the ground that part of the dividends made out of surplus were paid to the Ringwood Company and not to him, would be trifling. I will therefore disregard this factor and will deal with the case as if the dividends were all received by the trustees unless counsel for the life tenant desires to go further into this detail.
When trustees purchase stock, it is assumed that the purchase price is determined by the net assets of the corporation as of the day the stock is purchased and dividends received by the trustees must be apportioned as of that day in order to preserve the corpus intact. Other rules apply when trustees receive stock in a corporation as a dividend declared by another corporation. There has been no suggestion in the instant case that the Union Sulphur stock be itself apportioned, and I think it clear that these shares are all corpus. To apportion the dividends on the stock of the Union Sulphur Company as of May 8th, 1913, would be harder on the life tenant and more beneficial to the remaindermen than if the apportionment were made as of the date of the death of Mrs. Hewitt, since it appears that there was a large increase in the surplus of the company between her death and March 1st, 1913. But the Ringwood Company was wholly owned by Mrs. Hewitt at the time of her death and was divided among the residuary legatees of her estate, so that the predecessors of the complainants received one-sixth of the stock of that company. *Page 308 
I think that equity will be done to the remaindermen if dividends of the Sulphur Company be apportioned in the same manner as if this stock had become a part of the trust estate immediately upon her death.
I have dealt thus far with the dividends paid up to January 1st, 1930. The trustees have been put on notice that a substantial part of the dividends now being paid by the company are being made out of surplus. There appears no difficulty in their getting from the sulphur company annual statements of assets and liabilities showing its condition. They should each year compare the surplus with the surplus at the close of the preceding year and thus ascertain how much of the dividends received in the intervening twelve months have been made out of surplus and credit the corpus of the estate with that amount and credit income with the balance. It would not be fair, however, to the life tenant to withhold from him the whole of the monthly dividends received during the year until the trustees obtain from the company a balance sheet. From the immediate past, they may estimate what portion of the dividends are being made out of surplus and may make a tentative division monthly on that basis and then adjust when the balance sheet is received.
The second question presented by the bill is this: May complainants retain in the trust estate four hundred and eighty-seven shares of the preferred stock of the American Power and Light Company? The stock is not a legal investment. The only color of authority for the trustee to retain it appears in the will: "I hereby expressly authorize and direct my said executors and the trustees of each trust hereinafter created to accept at their fair value and to retain as legal investments of the trust funds, stocks or shares of any corporations which may form a part of my estate and to dispose of such stock or shares of each such corporation, only in connection with the sale of the majority of the holdings thereof of my estate and of the members of my family."
The power of sale was enlarged by codicil dated May 5th, 1906: "I authorize and empower the executors of my will in their discretion to sell and convey at public or private sale and for cash or upon credit, any and all of my personal *Page 309 
and real property which I have not specifically bequeathed or devised. I confer upon the trustees of each of the trusts created by my will and the codicils thereto, the same power of sale over any and all of the real and personal property which may constitute the respective trust funds." Mrs. Hewitt did not own shares of the American Power and Light Company. She did, however, hold at the time of her death shares of the Washington Water Power Company and of the Montana Power Company. One hundred and eight shares of the former and one hundred and twenty-five shares of the latter came into the possession of the trustees under her will and were part of the trust estate until 1928. In that year, the American Power and Light Company, a large public utility holding corporation, acquired control of the two former companies by exchange of stock. The complainants found it advantageous for the trust estate to make the exchange on the same terms as other stockholders and accordingly did so and thus received the preferred stock of the American Power and Light Company which they now hold. The American Power and Light Company owns the controlling interest in many public utility companies besides the Washington Water Power Company and the Montana Power Company. The gross earnings of these two companies were about twenty per cent. of the gross earnings of all subsidiaries of the American Power and Light Company in 1929. This may be accepted, for the purpose of illustration, as indicating that the stock of the Montana and Washington companies is twenty per cent. of the assets of the American Power and Light Company. The exact proportion is unimportant. When the trustees made the exchange, in substance, they sold four-fifths of their holdings in the Montana and Washington companies and acquired with the proceeds an interest in other utility corporations the stock of which Mrs. Hewitt did not own at her death. Furthermore, the stock which Mrs. Hewitt owned was in operating public utilities while the trustees have now shares of a holding company. I think it is clear that the trustees are not authorized by the will to retain the stock of the American Power and Light Company. P.L. 1899 p. 169 does not empower the court to direct the trustees to retain this investment. *Page 310