41 N.J. Super. 158 (1956)
124 A.2d 334
IN THE MATTER OF THE ESTATE OF CORA TALMAGE WEHRHANE, DECEASED.
Superior Court of New Jersey, Chancery Division.
Decided June 8, 1956.
*159 Mr. Charles B. Alling, attorney for defendant United States Trust Company of New York, as successor trustee, etc.
*160 Messrs. Toner, Crowley, Woelper & Vanderbilt (Mr. Marshall Crowley, appearing), attorneys for defendant Dorothy Wehrhane Lord.
Mr. Walter E. Cooper, attorney for defendant Doris M. McGovern.
Messrs. Soons & Soons (Mr. William R. Soons, appearing), attorneys for defendant St. John's Guild of the City of New York.
Mr. William H. Campbell, Jr., attorney for defendant New York Society for the Prevention of Cruelty to Children.
Messrs. Riker, Emery & Danzig (Messrs. Theodore McC. Marsh and Everett M. Scherer, appearing), attorneys for defendant The Hospital Center at Orange.
Messrs. Whiting, Moore & Phillips (Mr. Ira C. Moore, Jr., appearing), attorneys for defendants John Gardiner Lord, Mally Graham Lord and Talmage Lord.
Mr. Ronald A. Gulick, attorney for defendant Community Service Society of New York.
DREWEN, J.C.C. (temporarily assigned).
There should first be stated the background of litigation out of which the instant questions arise. The cause before us is the consolidation of two suits. Initially, suit was brought in the Essex County Probate Division by United States Trust Company of New York, as successor trustee under the will of Cora Talmage Wehrhane, deceased, for an accounting of the administration of the trust established under the will, and covering the period from March 13, 1950 to May 3, 1954. Some time thereafter suit was brought in this court (Docket No. C-389-54) by John Gardiner Lord and the infant plaintiffs Mally Graham Lord and Talmage Lord for construction of the will of the said Cora Talmage Wehrhane in the respect hereinafter stated. In the latter suit this *161 court ordered that all proceedings in the County Court, together with the pleadings and the record therein, be transferred to this court and that all issues raised in the cause thus transferred be consolidated for trial with the issues raised in the aforesaid suit for construction. A further order was entered that all pleadings and papers in the consolidated action be filed in the cause entitled and docket-numbered as shown at the head of this opinion.
We are also concerned, as will appear, with a third litigation, wherein suit was brought in this court by Calla Hale Wehrhane, executrix of the estate of Henry W. Wehrhane, deceased, for, among other things, an accounting of the administration of said trust by the decedent as its primary trustee, from the time of the trust's creation until decedent's death, a period of some 25 years. Divers complex issues and questions were raised in the litigation that followed. The suit was terminated by settlement, pursuant to which some $240,000 was paid by the estate to the successor trustee. The part had in that settlement by the present life tenant under the trust and its relation to one of the questions sub judice will be later dealt with.
The problem of construction in the John Gardiner Lord suit relates to the meaning and effect of the term "issue" in the "Eighth" article of the will, which reads as follows:
"EIGHTH: All the rest, residue and remainder of my property, whatsoever and wheresoever situate, I give, devise and bequeath to my Executor and Trustee, or his successor, hereinafter named, IN TRUST, nevertheless, to hold, invest and reinvest the same and pay over the net income thereof in equal quarterly installments to my husband, HENRY W. WEHRHANE, during his life; and upon the further trust, upon the death of my said husband, to continue to hold, invest and reinvest the same and pay over the net income thereof in quarterly installments to my said daughter, DOROTHY WEHRHANE LORD, during her life, and upon the further trust, upon the death of my said daughter, to pay over said fund with any accumulations thereon to the issue of my said daughter per stirpes absolutely. In the event that my said daughter shall die leaving no issue her surviving, then and in that event, I direct my Trustee to pay over the principal of said trust fund and any accumulations thereon, as follows:" (then follow various gifts over).
*162 The underlying facts are that the primary life beneficiary, Henry W. Wehrhane, died February 15, 1950, and upon his death the trust continued for the benefit of his daughter, said Dorothy Wehrhane Lord, for the term of her life. Dorothy Wehrhane Lord is 60 years of age. As the result of a divorce decreed in 1946, she was at the time of the trial of this case still unmarried. She has had no children, save only as the result of adoption by herself and her former husband during their marriage of the plaintiff John Gardiner Lord, who since the adoption has been known by that name. The will sub judice bears date January 5, 1925. Testatrix died March 13, 1925, a resident of West Orange, Essex County. The proofs show that John Gardiner Lord was never known to her and that his adoptive parents did not know of him until June 1929. The date of the adoption is January 14, 1931, over six years after execution of the will and approximately the same length of time after its probate. The plaintiff John Gardiner Lord is of full age and sui juris, and the infant plaintiffs Mally Graham Lord and Talmage Lord are his children.
The claim of the plaintiff John Gardiner Lord is that his status as adopted son of the present life beneficiary is such as to constitute him her "issue" within the meaning of the following phrase of the above-quoted article of the will: "* * * and upon the further trust, upon the death of my said daughter, to pay over said fund with any accumulations thereon to the issue of my said daughter per stirpes absolutely."
The relevant adoption statute in effect at the time of the making of the will and of testatrix' death, provides as follows:
"The adopted child shall not be capable of taking property expressly limited to the heirs of the body of the adopting parent or parents, nor property coming from the collateral kindred of such adopting parent or parents by right of representation."
Needless to say, we are not concerned with the present statute on the subject, which was not enacted until 1953 (N.J.S.A. 9:3-30B).
*163 The claim of John Gardiner Lord and his children must be denied. Their status is not within the term "issue" as contended. Notwithstanding the learned and expansive briefing this question has had I find the governing law to be so clearly and categorically established that there is nothing for this court to do on the question before it but to recognize the authority of In re Fisler, 131 N.J. Eq. 310 (Prerog. 1942), as that decision is affirmed in 133 N.J. Eq. 421 (E. & A. 1942). Subordinate decisions in the line of precedent are Fidelity Union Trust Co. v. Potter, 8 N.J. Super. 533, 539 (Ch. Div. 1950); Fidelity Union Trust Co. v. Hall, 125 N.J. Eq. 419 (Ch. 1939); Dulfon v. Keasbey, 111 N.J. Eq. 223 (Ch. 1932).
The determination of the question of issue leaves open for decision the status of the remaindermen named to take upon the termination of the present life tenancy. The language of the will (Eighth article) in its provision for the gift over after such termination is as follows:
"One-third thereof to the husband of my said daughter, Dorothy Wehrhane Lord, if living;
One-sixth thereof to said Doris M. McGovern;
And I direct my said Trustee to divide the remaining one-half of said fund in equal portions among the following charitable corporations, to wit: Memorial Hospital of Orange, New Jersey; The Orthopedic Hospital of Orange, New Jersey; Charity Organization Society of New York; New York Society for Prevention of Cruelty to Children; St. John's Guild, New York, and New York Association for the Improvement of the Condition of the Poor.
In the event that my daughter shall leave no husband, or issue her surviving, then it is my will and I direct that the one-third of said fund, which in case said husband were living would go to him, be divided between and I give and bequeath the same, in equal portions to said Doris M. McGovern and said Maud Pilkington Blacker."
I find and adjudge that Doris M. McGovern; Memorial Hospital of Orange, N.J.; The Orthopaedic Hospital of Orange, N.J.; Charity Organization Society of New York; New York Society for Prevention of Cruelty to Children; St. John's Guild, New York and New York Association for the Improvement of the Condition of the Poor, have each a vested remainder interest in the share of decedent's estate respectively *164 bequeathed them, such vested remainder being in each instance subject to the life interest of the present life tenant, and subject also to being divested by the birth and survival of natural issue of the present life tenant. One-sixth interest is vested in Maud Pilkington Blacker, subject to being divested should the present life tenant die leaving a husband her surviving; and an additional one-sixth interest is vested in the said Doris M. McGovern, subject to being divested upon the same contingency as that last stated. Cody v. Fitzgerald, 2 N.J. 93 (1949). For cases based upon facts essentially similar to those before us, see Trenton Trust & Safe Deposit Co. v. Robinson, 83 N.J. Eq. 226 (Ch. 1914); Miers v. Persons, 92 N.J. Eq. 17 (Ch. 1921); VanDyke v. Vanderpool, 14 N.J. Eq. 198 (Ch. 1862); Herbert v. Post, 26 N.J. Eq. 278 (Ch. 1875), affirmed 27 N.J. Eq. 540 (E. & A. 1876); Potter v. Nixon, 81 N.J. Eq. 338 (Ch. 1913), affirmed 82 N.J. Eq. 661 (E. & A. 1914); Fidelity Union Trust Co. v. Bond, 102 N.J. Eq. 494 (Ch. 1928).
We come now to the questions raised on the accounting. The first of these relates to certain tax payments made by the successor trustee to the Collector of Internal Revenue for capital gains for the trust years 1950 and 1951 respectively, payments made from corpus and without deduction by reason of the vesting of one-half of the remainder in charities. Payment by the successor-trustee of $14,575.57 was made on April 16, 1951, and payment of $7,072.63 was made on April 15, 1952, for the stated years respectively. Objection to these payments is now made by certain of the vested remaindermen, whose status as such at the time the tax payments were made was in no way, so far as appears, the subject of controversy or contention beyond being a taxpayer's problem. The provisions of the Internal Revenue Code relied on as allowing the charitable deductions reads (section 162(a) of the Internal Revenue Code in effect in 1950 and 1951):
"The net income of the estate or trust shall be computed in the same manner and on the same basis as in the case of an individual, *165 except that  (a) Subject to the provisions of subsection (g), there shall be allowed as a deduction (in lieu of the deduction for charitable, etc., contributions authorized by section 23 (o)) any part of the gross income, without limitation, which pursuant to the terms of the will or deed creating the trust, is during the taxable year paid or permanently set aside for the purposes and in the manner specified in section 23 (o), or is to be used exclusively for religious, charitable, scientific, literary, or educational purposes, * * *." (Italics supplied)
Not until the making of the instant decision has there been an authoritative pronouncement that these remainders are vested. When the tax payments were made it was an open question whether "any part of the gross income" was "permanently set aside for charitable purposes," or "to be used exclusively" therefor. The problem of "issue" as an impediment to succession by the charitable remaindermen confronted the successor-trustee, not to mention the further contingency, that which is still potentially operative in effectuating a divesting of the remainders as already indicated.
The decisions relied on by the objectors do not apply to the central question under this head, viz.: that of negligence on the part of the successor-trustee in making the disputed payments; they all deal with the major, substantive questions being presently decided, those of "issue" and vested succession. It should be observed, moreover, that the precedents urged by the objectors as determining the ultimate merits of the problems that confronted the successor-trustee as taxpayer, are urged precisely as if it had been incumbent upon the successor-trustee at its peril in that juncture correctly to resolve the ultimate merits of the questions before it. My attention is called to no authority for such an exaction and I am aware of none. This court, needless to say, is without jurisdiction for the making of a tax decision in the premises; and the point of the successor-trustee is well taken, that for all that appears there was no ground for concluding that, out of the situation confronting it at the time the tax payments were made, some portion of the subject capital gains would not turn out to be taxable. The testimony shows *166 clearly the full care and attention given the matter by the trustee.
I find that the successor-trustee acted with the required degree of care, caution and prudence; that its conduct was characterized throughout by fidelity and good faith. Honest mistakes and mere errors of judgment are not in themselves grounds for answerability. In re Griggs' Estate, 125 N.J. Eq. 73 (Ch. 1939) and cases cited.
"Whether the trustee has acted prudently depends upon the circumstances as they reasonably appeared to it at the time it acted and not as they may appear at some subsequent time." Bankers Trust Co. v. Bacot, 6 N.J. 426 (1951).
The tax payments are allowed; the exceptions thereto are dismissed.
The next question raised upon the accounting relates to the trustee's apportionment as between corpus and income, of two stock dividends declared by American Gas & Electric Company. The first of these was declared August 1, 1951, by which the trustee received 300 shares of the common stock of the corporation having a par value of $10 per share. The second was declared October 29, 1952, by which the trustee received an additional 315 shares of a par value of $5 per share, increasing the number of shares of common stock held by the trust to a total of 12,915 shares. The decrease in par value results from the fact that subsequent to the first stock dividend and prior to the second the company split its stock by issuing two shares of common stock of the par value of $5 for every share of common stock held.
There is no dispute that the shares themselves go to corpus, subject, however, to a charge thereon in favor of the life tenant designed to represent the latter's share in what the cases speak of as the amount of the life tenant's money, that is earnings or income, that went to purchase the dividend issue. The subjects of dispute here are the proper multiplier per share of the dividend stock, and whether the resulting cash value payable as income should be apportioned between the two life tenancies or should go to the present life tenant entirely.
*167 On the one hand it is proposed by the trustee that the par value per share be the figure used in calculating the charge to corpus, and that the method of computation be based on the ratio that the corporation's earned surplus on the day of declaration less the corporate earned surplus on the date of testator's death bears to earned surplus shown on the date of declaration. The trustee further contends that the result of such computation be apportioned between the first and second life tenants, what would otherwise be the first life tenant's share going to corpus by reason of the release given the trustee by the first life tenant's executrix in the settlement proceedings already mentioned. On the other hand, the present life tenant contends that not par value but the actual sum appropriated per share by the corporation in support of the dividend issue be used in calculating the charge upon corpus, the computation being on the basis of the ratio stated; and also that there be no apportionment between the two life tenancies, the present life tenant being entitled to the full sum for the reason that the same is made up of corporate earnings, appropriated by it in support of the dividend stock issue.
The trustee's proposed accounting is embodied in Schedule K of the accounting, the substance of which, as annexed to the pretrial order and made part thereof, is as follows:

"Allocation of Cash to Income
A. Suggested in Schedule K of trustees account.
 1. August 1, 1951 dividend
 Totals earnings transferred to capital
 stock account (300 shs. x $10. par value) ........... $3,000.00
 Income's charge on basis of earnings
 percentage (81.5027) from 3/13/25 ................... $2,445.08
 __________
 2. October 29, 1952 dividend
 Totals earnings transferred to capital
 stock account (315 shs. x $5. par value) ............ $1,575.00
 Income's charge on basis of earning
 percentage (81.832) from 3/13/25 .................... $1,288.85"
 __________

The foregoing figures are on the basis of one life tenancy but the trustee argues in its brief: "The trust before this *168 court, however, presents two life tenancies and the proper method of allocating the cash charge between such tenancies." And on the assumption that the method of apportionment is correct, the division between the life tenancies of the respective corpus charges is explained as follows: "* * * the amount of cash charge payable to the first life beneficiary as a result of the stock dividends of American Gas & Electric Company is $2,210.35 for the 1951 stock dividend and $1,144.50 for the 1952 stock dividend, and the amounts payable to Mrs. Lord are $234.73 and $144.35 respectively."
As for the 1951 stock dividend, it is shown, indubitably it appears, by the proofs as well as by the pretrial order that it was supported by a transfer to capital stock from surplus earnings of funds equivalent to $50 per share of the stock dividend. As for the 1952 stock dividend, it is shown in like manner that a similar transfer to capital was made equal to $27.50 per share of the stock dividend. Appended to the pretrial order and made part thereof is a schedule showing the second life tenant's proposed alternative method of computation, based upon the figures last herein given. The schedule is as follows:

"B. Suggested by Dorothy Wehrhane Lord, Secondary Life Beneficiary;
 see alternative Method A in Schedule K of trustees
 account.
 On the basis of the amount per share transferred to capital
 stock and to capital surplus account from surplus at the
 time of the stock dividends.
 1. August 1, 1951 dividend
 $50. per share transferred × 300 shs. ....... $15,000.00
 Income's charge from 3/13/25 (81.5027%) ..... $12,225.41
 __________
 2. October 29, 1952 dividend
 $27.50 per share transferred × 315 shs. ..... $ 8,662.50
 Income's charge from 3/13/25 (78.979%)
 (see figures under Schedule K) .............. $ 6,841.56
 __________
C. If under B. the amount per share transferred to capital surplus
 only is used, the result would be as follows:
 1. $40. × 300 shs. ............................. $12,000.00
 × 81.5027% .................................. $ 9,780.32
 __________
 2. $22.50 × 315 shs. ........................... $ 7,087.50
 × 78.979% ................................... $ 5,597.73"
 __________

*169 The trustee relies with respect to apportionment between the life tenants, on the Chancery decision in Hagedorn v. Arens, 106 N.J. Eq. 377 (Ch. 1930), and for the par value per share proposition on those cases, infra which speak of the use of par value as the "usual" thing. The claim of the second life tenant rests upon the following propositions and grounds: (a) in the absence of testamentary provision to the contrary, a life tenant is entitled to a charge or lien upon shares declared as a stock dividend for so much of the dividend as represents earnings of the corporation since the severance of income and corpus; (b) to realize the satisfaction of his interest in the dividend, in a case where the stock dividend is declared wholly out of earnings during a period subsequent to the severance of income and principal, the charge to which the life tenant is entitled is a charge for the entire amount transferred to capital in support of the dividend; (c) the two stock dividends in the present case were derived wholly from surplus net earnings long subsequent to severance of income and principal, the first dividend being derived from such earnings between January 1, 1948 and June 30, 1951, and the second dividend from such earnings between July 1, 1951 and September 30, 1952. The severance having occurred upon the death of testatrix on March 13, 1925, corpus is entitled to no portion of the dividend, its entire value belonging properly to income; (d) the first life tenant having died February 15, 1950, prior to the declaration of the first of the two stock dividends, the second life tenant is entitled to the full amount thereof, notwithstanding the holding in Hagedorn v. Arens, supra; (e) even on the assumption of a required apportionment between the estate of the first life beneficiary and the second life beneficiary, the claim of the first life tenant's estate is defeated by the terms of settlement of the Colla Hale Wehrhane litigation and the releases given therein as already mentioned; (f) that all funds appropriated by the corporation in support of the stock dividend had their origin in corporate earnings and did not lose their character as income by reason of anything incidental to the settlement referred to.
*170 It is well at this point to clear up the matters in factual dispute. The first of these has to do with the derivational period of the earnings appropriated to support the two stock dividends. It is the contention of the second life tenant that the first stock dividend was paid out of surplus net earnings originating in the period from January 1, 1948 to June 30, 1951; that the second stock dividend was paid out of surplus earnings originating in the period from July 1, 1951 to September 30, 1952, and that all such appropriated earnings are entirely allocable to income. I find it to be preponderantly established by the proofs in the case that it was earnings for the respective periods stated that actually went to the support of the dividend stock issues. On the part of certain of the remaindermen it is contended, in effect, that we must be governed by the respective corporate resolutions by which the stock dividends were authorized. The pertinent portion of the resolution for the stock dividend of August 1, 1951, is as follows:
"RESOLVED that, subject to the issuance of an order of the Securities and Exchange Commission under the Public Utility Holding Company Act of 1935 in form and substance acceptable to this Company and to the listing, upon official notice of issuance, of not in excess of 271,739 additional shares of Common Stock on the New York Stock Exchange, a dividend of one share of the authorized but unissued Common Stock of this Company for each twenty shares of the issued Common Stock of this Company outstanding in the hands of the public, be and the same hereby is declared out of the surplus net earnings of the Company, payable September 10, 1951, to the holders of such stock of record on the books of the Company at the close of business on August 10, 1951; * * *." (Italics supplied)
The pertinent portion of the resolution for the stock dividend of October 29, 1952, is as follows:
"RESOLVED, that subject to the issuance of an order of the Securities and Exchange Commission under the Public Utility Holding Company Act of 1935 in form and substance acceptable to this Company and to the listing and registration upon the New York Stock Exchange, upon official notice of issuance, of the shares of Common Stock of this Company hereinafter mentioned, a 2 1/2% stock dividend be and the same hereby is declared out of the surplus net *171 earnings of the Company, payable March 10, 1953 to holders of Common Stock of record on the books of the Company at the close of business on February 2, 1953, * * *." (Italics supplied)
The argument drawn by the remaindermen from these resolutions is that since the stock dividends are declared out of "surplus net earnings of the company" without limitation as to time or period, they are payable from the "mass" of the surplus and not from surplus derived during any particular interval. Assuming that point of objection to be material, my thought is that the breadth and scope of the authority given by the resolution is not the controlling factor, but rather what it was that the corporation actually did within the authority thus conferred. It is my judgment that I am compelled to find from the proofs to be noted that the earnings that went to support the two stock dividends are those originating within the periods stated, that is from January 1, 1948 to June 30, 1951 and from July 1, 1951 to September 30, 1952. The proof of this lies, as I conclude, in certain documentary exhibits, or in a number of them, that were placed in evidence under a stipulation contained in the pretrial order, as follows:
"The following exhibits are to be marked in evidence subject to the right of any party to object as to the materiality and relevance of the same at the time of trial; they shall all be regarded as evidential according to their purport."
All of such exhibits that I have considered in the making of these factual findings I deem to be material and relevant.
The "purport" of Exhibit C-17(a) and C-17(b), to mention no others, is clearly to show, in my opinion, the sufficiency of the earnings for the respective periods appropriated to support the respective stock dividends; and from which the further inference is drawn that the company in declaring the stock dividends confined their support to the surplus earnings for the stated periods. The exhibits here referred to are the applications of the corporation for the listing of both issues of stock dividend shares on the New York Stock Exchange.
*172 Next as to the matter of settlement release. In the termination of the aforementioned suit brought by the Henry W. Wehrhane estate there was paid to the present life beneficiary out of a settlement fund of $240,000 a sum of approximately $40,000. It is contended in the briefs of certain of the remaindermen that such payment involved its recipient in the release by her of any and all further claim for the accrued earnings or income now in controversy so as to preclude her from making the claim that she presently advances. The briefs containing these arguments were filed before trial. At the trial there was read into the record, by counsel for the present life tenant, a stipulation in the following form, with accompanying comment by the life tenant's counsel:
"`It is agreed under the settlement of the prior proceedings and the judgment entered therein on July 14, 1953, no part of the $240,000 paid by the plaintiff in that action was paid either to Dorothy Wehrhane Lord or to the corpus of the trust on account of the stock dividends of the American Gas & Electric Company involved in this action, and that insofar as said stock dividends are concerned the settlement and judgment provided only that any and all claims thereto by Calla Hale Wehrhane, individually and as executrix of the last will and testament of Henry H. Wehrhane, deceased, were abandoned, released, barred and dismissed. The question of the disposition of these stock dividends as between corpus and Dorothy Wehrhane Lord is open for determination in this cause.'
I think that is self explanatory and, as I understand, your Honor is to take that statement in lieu of any statement or briefs that may suggest something to the contrary."
The record shows there was no dissent. I find that the making of the instant claim by the present life tenant is in no wise impeded either by the so-called release urged in the several briefs, or otherwise.
The remaining question has to do with the availability for distribution as income to the present life tenant of the earnings realized during the lifetime of the preceding life tenant, that is, during the period from January 1, 1948 to February 15, 1950. In the settlement of the aforementioned suit brought by the first life tenant's estate, release was given by the executrix to the successor-trustee, the effect of which was to release the latter from the payment of any sum or *173 sums that would otherwise be due and owing to the estate for income during the lifetime period last stated. The sum that would otherwise have been distributable to the estate of the first life tenant and released in the manner stated was retained by the successor-trustee, placed by it in corpus and it is so accounted for. The argument is made by the present life tenant that there should be no apportionment of income as between separate and successive life tenants; that the moneys in question are not properly a part of corpus; that having had in truth and fact at all times the status and character of income, such moneys cannot be deprived thereof by their appropriation to corpus; that, being income, they belong properly to the present life tenant.
The guiding principles of apportionment are clearly set forth in the cases. And I find them entirely consonant with the instant claims of the life tenant. In McCracken v. Gulick, 92 N.J. Eq. 214, at page 217 (E. & A. 1920), the court said:
"* * * But for the necessity of the directors of the corporation guarding against business risks and possible future misfortunes, all earnings of the corporation made after the testator's death might be distributed to the life tenants, since all such earnings are income on the investment as it stood at that time. As long as proper management required that these earnings be not distributed, they may be retained, but when the time comes for a distribution it is equitable that the portion of earnings after testator's death to be distributed should go to the life tenant. A difficulty, however, arises when the distribution takes the form of a stock dividend. As the Vice Chancellor pointed out in Day v. Faulks [81 N.J. Eq. 173], a stock dividend, if transferred to the life tenant, gives him not only earnings during his life tenancy but an interest in the original capital and earnings prior to testator's death. A stock dividend may well be large enough to reduce the book value as well as the market value of the stock held for the corpus of the estate because it amounts to giving each share a smaller proportionate interest in the assets of the corporation. It will certainly lessen the proportionate interest of the estate in the corporation, a result that cannot have been contemplated by the testator. His desire for the welfare of the life tenant would necessarily lead him to preserve intact the principal of the trust fund; that has been the guiding principle of our decisions. To withhold all dividends would strengthen the corpus of the estate, but the testator can hardly mean to starve the life tenant for the benefit of remaindermen, whom he often has never seen. What is *174 necessary is an equitable rule for the ascertainment of the respective interest of life tenant and remanderman in surplus which has been converted into capital stock. To use the language of the Vice Chancellor in Day v. Faulks, the company `has made a disposition' of the earnings to that extent. We still think the rule in Day v. Faulks is equitable."
In Day v. Faulks, 79 N.J. Eq. 66, at page 67 (Ch. 1911), affirmed 81 N.J. Eq. 173 (E. & A. 1912), Vice Chancellor Stevens said:
"I must start out with the assumption that stock dividends, declared after the death of testator, go, in so far as they represent earnings made since his death, to the life tenants. So far there is no difficulty. But in the case in hand the question, distinctly raised I think for the first time in this court, is whether under the name of stock dividends the life tenants are entitled to anything more than earnings."
It is in order to say respecting the latter dictum that the life tenant in the instant case seeks no more than earnings.
Other cases embodied in the line of decisional authority on this subject are Ballantine v. Young, 79 N.J. Eq. 70 (Ch. 1911); Koehler v. Koehler, 99 N.J. Eq. 141 (Ch. 1926); Plainfield Trust Co. v. Bowlby, 107 N.J. Eq. 68 (Ch. 1930); Union County Trust Co. v. Gray, 110 N.J. Eq. 270 (Ch. 1932); Lang v. Lang's Executors, 57 N.J. Eq. 325 (E. & A. 1898); Hewitt v. Hewitt, 113 N.J. Eq. 299 (Ch. 1933); Graves v. Graves, 115 N.J. Eq. 547 (Ch. 1934).
In Lang v. Lang's Executors, supra, it was said:
"The underlying principle, applicable in this case, is that no corporate dividend, declared after the right to the income has become severed from the ultimate ownership of the stock upon which such dividend is declared, belongs in equity to the person entitled to income except so far as it is derived from the earnings of the stock after such severance." (Italics supplied)
And again in McCracken v. Gulick, supra, it is said:
"* * * We still think the rule in Day v. Faulks is equitable. It gives the new capital stock to the estate but subject to a charge in favor of the life tenant of the amount of his money used to pay for the stock, usually the par value." (Italics supplied)
*175 And to like effect in Hagedorn v. Arens, supra, Vice Chancellor Buchanan said:
"The new capital stock goes to corpus, subject to a charge in favor of the life tenant (or life tenants) of the amount of his or their money (share of earnings) used to pay for the stock  usually at the par value of the stock."
No fixed principle is indicated by the reference in the McCracken and Hagedorn cases to par value as the "usual" standard. In a situation that includes, as this one does, specific knowledge of the amount "used to pay for the stock" there could be no reason for making the computation on the basis of par value on the ground merely that such a basis is "usual."
In Union County Trust Co. v. Gray, supra, Vice Chancellor Backes said:
"Where the income is severed from the ownership of capital stock and given to one for life, ordinary dividends, i.e., dividends periodically declared in the regular course of business, whether out of surplus, current profits, or both, ordinarily belong to the life tenant. Judicial convenience forbids that the source be inquired into. Earp's Appeal, 28 Pa. 368. Extraordinary dividends may be apportionable between corpus and income. If they include surplus or accumulated profits at the time of the severance they are to be apportioned; if they are made up of profits accumulated after the severance, they are not; they belong to the life tenant." (Italics supplied)
A word concerning the trustee's chief reliance on Hagedorn v. Arens, supra, for its apportionment as between the life tenants, and the imputed obligation of this court to follow that decision. That case, decided in this court, appears to be one of novel impression in its dealing with two successive tenancies. But the question whether or not there should be such an apportionment does not, strictly speaking, present itself in the present case. That problem is here displaced by another. Here the first life tenant (represented by the executrix) makes no claim. It is the trustee who claims for corpus the share that would otherwise have gone to the first life tenant, and that claim in turn is involved in questions *176 concerning the effect of the executrix' release, already discussed.
For what it may be worth, counsel for the trustee calls attention to the 1952 enactment, N.J.S. 3A:14A-4, which provides among other things that in a situation like that here presented all stock dividends shall be principal. I think no more need be said of this legislation save only that what it indubitably effectuates is the establishment of a rule of convenience. The instant case, meanwhile, is not to be removed from its place in the pre-statutory phase of the law whereunder the function of the court is to solve the problem presented in accordance with its conception and appraisal of the accompanying equities.
I determine from the facts as found and from the decisions, that the life beneficiary's contentions are valid throughout. Respecting the matter of release, certainly the accident of settlement negotiations and the giving of release therein by the executrix in the general composition of her differences with the successor-trustee and others cannot determine that the money in question should go to corpus rather than to the second income beneficiary. There is no dispute that except for the release the money would have been paid to the first life tenant's estate. Appended to the trustee's main brief is a statement designed to explain the figures in the trustee's system of apportioning between the two life tenancies. Except for the figures, the statements read the same for both stock dividends. That for the first is: "The difference between $2,445.08 and $234.73 is $2,210.35, the amount which would have been payable to the estate of the first life beneficiary but now belongs to the corpus of the trust." If the amount "would have been payable to the estate of the first life beneficiary" I am aware of nothing that should now prevent its payment to the second life beneficiary; and the words "but now belongs to the corpus of the trust" appear to me a manifest non sequitur.
It could not at any time have been properly a question as to whether the amount was to be paid to one life tenant or the other. Once it was made available for payment as income *177 under the trust that fact alone made it payable to the life tenant available at the time.
I judge the proper method of apportionment to be that indicated in the pretrial order as hereinabove set forth, which shows the figure of $50 per share, the resulting value of the issue going to the present life tenant. The trustee is instructed accordingly.
Let an order be presented for judgment in accordance with the views hereinabove expressed.