Complainant is trustee under the last will of Peter Cooper Hewitt, who died in 1921, a resident of this state. The residuary estate was given to complainant in trust to pay the income to testator's widow and to his daughter, Ann Cooper Hewitt, for life, with remainder to Ann's issue, and in default of issue, then to the Cooper Union for the Advancement of Science and Art. Testator owned ten shares of the capital stock of the Union Sulphur Company which became a part of the residue of his estate and which are *Page 317 
still held by his trustee. The bill prays the direction of the court as to the apportionment of dividends on this stock, between income and corpus.
Complainant has filed in the orphans court several intermediate accounts on which decrees have been entered apportioning the dividends or approving the apportionment made by the trustee. These adjudications dispose of all dividends received prior to 1930. Since the amendment to the Orphans Court act (P.L. 1905p. 300), the decree of the orphans court upon an intermediate accounting of a trustee has the same weight as a decree of the same court upon a final accounting. In re Slater, 88 N.J. Eq. 296; Beam v. Paterson Safe Deposit and Trust Co., 96 N.J. Eq. 141; affirmed, 99 N.J. Eq. 427. The decrees are conclusive on all questions which were raised or which might have been raised, and upon all parties to the accounting proceedings, or represented therein. Woolsey v. Woolsey, 78 N.J. Eq. 517;Shearman v. Cameron, 78 N.J. Eq. 532.
Not only are the decrees conclusive in controversies between the accountant on the one side and the beneficiaries of the trust on the other, but also the decrees are conclusive in subsequent litigation between different classes of beneficiaries. Concretely, the remaindermen, while admitting that complainant is protected by the decrees, cannot assert that the application of dividends to income and the payment thereof to the life tenants which have been approved by the orphans court, were erroneous and that the dividends should have been apportioned to corpus, and hence that future income should be withheld from the life tenants and credited to corpus until the alleged deficiency in thecorpus account be made good.
The only question left open for discussion and decision is the disposition of the dividends of 1930 and 1931. The principal business of the Sulphur Company is the production of crude oil. Formerly it was engaged in mining sulphur but its mines were exhausted several years before 1930. The source of the dividends paid by the company in 1930 and 1931 was as follows: *Page 318 
 Net income ................................................ $1,057,522
 Oil depletion ............................................. 452,167
 Adjustments of surplus account ............................ 482,145
 __________
 $1,991,834
 Charged to surplus ........................................ 2,383,966
 __________
 Dividends 2200% ........................................... $4,375,800

The surplus, when testator passed away, was much greater than at the beginning of 1930, so that I can say safely that, in so far as the dividends for 1930 and 1931 were charged against surplus, they were made out of earnings derived by the company before testator's death and do not belong to the life-tenants but are a part of the corpus. Lang v. Lang's Exrs., 57 N.J. Eq. 325.
The item, adjustments to surplus $482,145, results principally from capitalizing oil well equipment which had previously been charged off as an expense. As the development of the oil resources of the company did not begin until after testator's death, I assume that the cost of this equipment had the effect of diminishing the apparent earnings in the intervening years and so this item should be treated as income.
The income tax regulations of the federal government permit an oil producer to deduct from income a figure for depletion of oil reserve equal to twenty-seven and one-half per cent. of the amount of oil sold or fifty per cent. of the net proceeds of the oil sold, whichever is lower. The company, to take advantage of this rule, charges its income account for the depletion of the oil. Thus the net income for 1930 and 1931, $1,057,522, was reached after deducting for depletion $452,167. But at the close of each year it adds directly to surplus account the same amount which has been deducted for depletion. So its surplus at the end of 1931 was exactly the same as if the net income had been $1,509,689 and as if there had been no charge for depletion.
There seems to be no method of measuring the depletion of oil in the ground. We assume that some day the oil supply in any given field will be exhausted, but whether the wells will begin to indicate exhaustion next year or not for twenty-five *Page 319 
years, there is no way of determining. Conversely, when the company's oil shall be eventually exhausted, it may appear that the charge of $452,167 in 1930 and 1931 was grossly excessive or entirely inadequate. This item is not, and is not intended to be, a measure of the actual depletion. In this respect, depletion of oil differs from depletion of a mine or a quarry. It is generally possible, by surveys and drilling, to estimate the amount of ore in the ground, and so to reach a figure for depletion which, by the time the mine is exhausted, will have built up a reserve roughly approximating the value of the ore at the beginning of the operation. As ore is removed from a mine, the mine decreases in value because a prospective purchaser will be able to calculate the amount of ore remaining. But an oil well, so long as it shows no signs of exhaustion, presents a different problem. The purchaser's guess of the future yield may be even greater at the end of the year's operations than at the beginning, and so the value of the well is not lessened by the amount of oil which has, in the past, been obtained from it.
The action of the management of the company in respect to its books of account, is presumably correct. Ballantine v. Young,79 N.J. Eq. 70. The books of the Union Sulphur Company indicate that its management does not regard the drawing of oil from its wells as reducing the value of its property or diminishing its surplus. I accept their judgment and will hold that the entire amount of the dividends, except so far as they are made out of the surplus account, should be apportioned to income. The result is that out of the dividends in question, $10,014 should be apportioned to income and $11,986 to corpus.
Counsel for the trustee contends that ordinary cash dividends should be treated as income regardless of their source. The presumption is that such dividends are derived from current income and a trustee, in the absence of notice to the contrary or circumstances which should lead to inquiry, may safely act on this presumption. But when the question is presented to the court and the evidence shows that dividends are not derived from earnings made by the company *Page 320 
since the right to income has been severed from the ultimate ownership of the stock, then it must be held that there is no distinction as to apportionment between extraordinary and ordinary dividends. Lang v. Lang's Ex'rs, supra; Brown v.Brown, 72 N.J. Eq. 667; Beattie v. Gedney, 99 N.J. Eq. 207;Hagedorn v. Arens, 106 N.J. Eq. 377.
Complainant may take a decree pursuant to the views above expressed.