The complainant, Girard Trust Company, the surviving trustee under the will of Theophilus J. Zurbrugg, deceased, seeks by this bill instructions with respect to the administration of certain trusts, particularly relating to its allocation of moneys received by the trustee from Keystone Watch Case Company, Keystone Watch Case Corporation and Keystone Corporation, and for a construction of testator's will in so far as it relates to the matters in controversy.
The testator died on November 20th, 1912; his will, dated June 11th, 1909, was probated on December 2d 1912, by the surrogate of Burlington county. Prior to his death he was president and owned approximately one-sixth of the stock of the Keystone Watch Case Company. These shares, to the number of ten thousand and twenty-three, made up almost his entire estate, the inventory disclosing that of the assets of his estate — $1,016,000 — approximately $952,000 was represented by the Watch Case Company stock. His will, which seems to have been prepared with great care, covers twenty-four printed pages, and a codicil thereto covers eleven printed pages.
The testator, as well as being president of the Watch Case Company, was also its founder and had devoted a large part of his lifetime in building up the company, and his will indicates that he had its future welfare in mind as appears from the following paragraph in his will:
"Second. Inasmuch as a large portion of my estate consists of shares of the capital stock of The Keystone Watch Case Company, and as my constant endeavor for a long period of years has been the building up of that Company, I desire that after my decease, my estate, or those representing it, shall continue to aid in the conduct of the business and of the administration of the affairs of that Company, along the lines heretofore pursued by me, and I authorize and *Page 600 
empower my executors, acting either as executors or as trustees under the terms and provisions of this my last will and testament, to hold or retain any part of, or the whole of such shares of the capital stock of The Keystone Watch Case Company as I may own at the time of my decease, for such time as they may in their discretion deem best for the interest of both my estate and of said Company; they shall not be held liable for any loss occasioned by their so retaining and holding said stock, save for willful and gross negligence.
It is my wish and desire that my said executors, acting either as executors or as trustees, shall, at their discretion, and within a reasonable time, dispose of such shares of said stock as may be necessary to liquidate any loans made on any of said shares as I may die possessed of. They shall, however, not dispose of said shares of stock at a sacrifice, or in any manner that will impair the value of my remaining shares.
It is my wish and desire, and I hereby order and direct, that the shares of stock of the said The Keystone Watch Case Company, which shall belong to my estate, shall be voted by my executors and trustees in such manner as the majority of my said executors and trustees may determine."
Under his will and codicil he bequeathed about $73,000 to personal friends and distant relatives. He had no children, and from his will and codicil it is quite apparent that he intended that his wife, who survived him, should be fully protected. He endowed a hospital which was later erected at Riverside, New Jersey, where he resided at the time of his death, and which now bears his name, with the major portion of his estate, making that hospital the residuary beneficiary.
Under the twentieth paragraph of his will testator gives his widow, Lizette Zurbrugg, $250,000, together with certain real estate which includes his homestead. In the eighth paragraph of the codicil to the will he refers to this bequest to his wife as $250,000 in money.
In the twenty-first paragraph of his will he gives the sum of $250,000 to his executors and trustees in trust, to pay the income to his widow for life and upon her death the principal to become part of his residuary estate.
In the eleventh paragraph of the codicil to his will he provides that, in the event that there be insufficient funds in his estate to pay all the beneficiaries, all the legacies, bequests and devises made to his wife, Lizette Zurbrugg, together with the $250,000 trust fund set up for her benefit, shall be first *Page 601 
paid to her and for her benefit and shall not prorate with any other legacies or devises on account of any depreciation in the value of his estate and its inability to pay all legacies and devises in full. He also provides in the same paragraph that the legacies, devises and bequests to his mother, Anna Barbara Zurbrugg, and his brother, August J. Zurbrugg, shall then be preferred, his mother first, and his brother second, and that they shall not prorate.
The widow, Lizette Zurbrugg, the Girard Trust Company and Charles H. Hulburd are named as executors and trustees under the testator's will. Mrs. Zurbrugg died in 1923, and Charles H. Hulburd died in 1924, leaving the Girard Trust Company at this time the sole executor and trustee.
The testator's will, under the twenty-third paragraph, provides a trust fund of $33,500 for the benefit of his said brother, August J. Zurbrugg, during his life, upon his death the principal to be paid to his lawful issue. He died in 1928 leaving three children.
In the twenty-fourth paragraph the will provides a trust fund of $66,500, the income to be paid to the lawful issue of the said August J. Zurbrugg during their lives, and upon the death of any such issue, their proportionate share to be paid to the lawful issue surviving the decedent.
In the twenty-fifth paragraph a trust of $66,666 is provided, to pay the income to Johanna Mathilda Ritschard and Alice Olga Ritschard for life, and upon their respective deaths provision is made for their issue.
Under the twenty-seventh paragraph of the will $50,000 is given in trust to pay the income to John G. Mueller, brother of testator's widow, during his life, and upon his death the principal to be paid to Mueller's lawful issue. He died on March 9th, 1934, leaving lawful issue.
In the twenty-eighth paragraph $25,000 is given in trust, the income to be paid to Margaretta Elizabeth Rapp (now Englerth) for life, and upon her death the principal to her lawful issue. She also survived the testator.
Under the tenth paragraph of the codicil, $75,000 is given in trust to pay the income to said Margaretta Elizabeth Rapp "to keep and maintain my homestead, dwelling house," after *Page 602 
the death of testator and his widow, and upon the death of Mrs. Englerth the corpus is to go to her lawful issue.
Under the twenty-ninth paragraph of the will $250,000 is given in trust for a hospital which was subsequently erected and named the Zurbrugg Memorial Hospital. The testator's widow, Lizette Zurbrugg, his brother, August J. Zurbrugg, his brother-in-law, John G. Mueller, and Alexander P. Small and Eckard P. Budd, or the survivors of them, are named as trustees of said hospital with the right to fill vacancies. Among other things, that paragraph of the will provides:
"* * * the said trustees having charge and control of said corporation, after having expended one hundred thousand dollars, or whatever sum they find necessary to expend for the ground, needful buildings, furniture, equipment, c., for the said hospital, are to invest the remainder of said two hundred and fifty thousand dollars for an endowment fund, the income from which they are to apply for the necessary expenses and support of said hospital or institution for all time to come; and, if found needful, a portion of the principal; it is, however, my desire that they infringe as little upon the principal as they can in their discretion; in making investments for the endowment fund, I give the following directions to the said trustees, namely, the said trustees shall have power to hold at their discretion any securities that may pass into their hands from my estate, and in case any of said securities shall be the capital stock of The Keystone Watch Case Company, I desire that they shall hold the whole, or a large portion, in such shares of stock, for such time as they may in their discretion deem best; it being my particular desire that they shall not sell the shares of the capital stock of The Keystone Watch Case Company in such quantities as in any wise might work any injury to said Company; * * *"
Under the thirtieth paragraph of the will, the decedent's residuary estate is given to his executors and trustees in trust for the benefit and advantage of the said hospital; and upon the termination of all the trusts set up in the will, it is directed that "the principal sum of said rest, residue and remainder of my estate, together with any accrued interest thereon, shall be paid by my executors and trustees hereinafter named, or the survivors of them, or their successors in the trust, unto the trustees of the hospital or institution founded and endowed by me in paragraph twenty-nine of this my last will and testament."
In this paragraph he also provides: *Page 603 
"* * * It is my will, however, that all of the trusts hereinbefore created by me in this my last will and testament, shall, at their termination, be paid in full to the persons at that time entitled to receive the principal sum or sums held in trust, and realizing that the sums of money, stocks, or other securities set apart by my executors and trustees hereinafter named, or their successors in the trust, to form the principal of said trust funds, might either increase or diminish in value, and it being my will that the persons ultimately receiving the principal sum or sums of said trust funds shall receive exactly the amount named by me for said trust funds to be held for their benefit, I desire to make provision in this my last will and testament, so that the beneficiaries of said trust fund shall receive the amounts of said trust funds as provided by me in this my last will and testament; I therefore order and direct my executors and trustees hereinafter named, or their successors in the trust, upon the termination of each of the trusts hereinbefore created by me, to pay to the person or persons entitled to the principal sum of said trust funds, the exact amount of said trust funds as named by me in this my last will and testament. If the securities set aside by my executors and trustees hereinafter named, or their successors in the trust, shall amount in value to more than the sum set aside for the principal sum of said trust funds, then I order and direct my executors and trustees hereinafter named, or their successors in the trust, to pay over the excess derived from the sale of said securities to this the residue of my estate, and do hereby dispose of said excess the same as I have disposed of the rest, residue and remainder of my estate in this paragraph of my will. If the securities set aside by my said executors and trustees hereinafter named, or their successors in the trust, shall decrease in value to less than the sum set aside for the principal sum of said trust funds, then I order and direct my executors and trustees hereinafter named, or their successors in the trust, to take from the principal sum of the rest, residue and remainder of my estate, held by them in trust for the benefit of said hospital or institution under this paragraph of my will, a sufficient sum or sums to make the amount to be paid to the persons receiving the principal of said trust fund or funds the exact amount named by me in the paragraph of this my last will and testament creating said trust fund of funds. * * *"
The thirty-third paragraph of the will is as follows:
"Thirty-third. Should any of the beneficiaries under this will object to the probate thereof, or in any wise, directly or indirectly contest, or aid in contesting the same, or any of the provisions thereof, or the distribution of my estate thereunder, then and in that event I annul and revoke any bequest or devise herein made to such beneficiary, and it is my will that such beneficiary shall be absolutely barred and cut off from any share in my estate; and in such event I hereby give, devise and bequeath the bequest or devise made to such beneficiary to the trustees of the hospital or institution founded and *Page 604 
endowed by me in paragraph twenty-nine of this my last will and testament, and in and by said paragraph directed by me to be established as a corporation under the laws of the State of New Jersey."
The bequests under the will total the sum of $1,140,000. It is apparent from the reading of the will and codicil that the testator intended that the bequests should be in cash except where otherwise indicated. It will be noted that the legacies and trusts set up in the will are provided for in "dollars;" and in the codicil to the will, in paragraph 8, it will be noted that he recites: "Whereas, in my said will I did, among other things, give and bequeath unto my wife, Lizette Zurbrugg, $250,000 inmoney," thus indicating more clearly his intentions.
Since the stock of the Watch Case Company constituted approximately nine-tenths of the estate, the executors were obliged to defer the payment of the legacies and the establishment of trusts because the stock could not be marketed except at a great sacrifice to the various beneficiaries. An appraisal of $95 a share had been placed upon the stock as of the date of decedent's death and efforts were made to market some of it; after continuous advertising two hundred shares were sold at $90 per share. The testimony shows that it would have been impossible to sell any substantial amount of the stock without greatly depressing the market price. There was only a limited market for it, and it was quite apparent that in order to conserve the assets and to carry out the desires of the testator, the executors were justified in delaying the settlement of the estate, particularly in view of the desire of the beneficiaries who would have been very unfavorably affected, if not entirely deprived of certain legacies, by any other course.
Mary A. Mueller, executrix of John G. Mueller, deceased, filed exceptions to the trustees' account in the Burlington county orphans court. Before the disposition of the questions raised therein, the present bill of complaint was filed. Mr. Mueller was a brother of testator's wife, one of the executors, and during the period of administration of the estate was advising with the executors. He was closely connected with the Keystone Watch Case Company as a director and *Page 605 
officer. During the period from 1912 to 1922, in which latter year a distribution of the estate was made, it seems to me that the executors carried out the testator's wishes as expressed in his will concerning the handling of the Watch Case Company's stock. Testator did not wish that stock sold in such quantities as might in anywise work injury to said company. In addition to that, his widow, Mrs. Zurbrugg, a preferred legatee, was likewise concerned. Mr. James H. Tuttle, assistant vice-president of the Girard Trust Company and connected with the trust department, was closely in touch with the affairs of the estate, and expressed quite clearly the reasons for the delay in setting up the trusts and making distribution which finally took place following an agreement signed by the interested parties in 1922. In answer to a question on the subject, he said:
"We had innumerable conferences as to values, investments, and things of that kind, and we couldn't carve out these trusts as provided in the will unless they all abated, and if we had to sell the stock we would have had to sell it at a forced sale, and probably no one would be interested in the estate except Mrs. Zurbrugg, who had a preferred bequest of $250,000 absolutely, and $250,000 in trust. We carried the administration along hoping we might find a way out to set up these trusts for the several beneficiaries. Mrs. Zurbrugg was anxious that her relatives should not be wiped out, and Mr. Mueller was in the office practically every day, or weekly, anyway, trying to see some way to get these people some interest in the estate, and we finally arrived at it by averaging the income from the estate and giving them out of the income received from all sources in our hands of the whole estate a certain percentage, and that kept them feeling they were getting a fair return on what the trust would have been if set up. The payments were made to the several beneficiaries out of the general funds that came into our hands, and not out of any particular trust, and I think the rate was five per cent., it may have changed from time to time, but it was what we considered should be paid by the estate."
During this period of ten years the executors filed three accounts in the Burlington county orphans court, the first in *Page 606 
1918, the second in 1920, and the third in 1922, all of which were approved.
It seems to be quite apparent that the Watch Case Company stock, of which nine thousand eight hundred and twenty-three shares were held by the estate, could not be marketed at prices which would produce sufficient money to pay the legacies and set up the trusts. Mr. W.C. Tuttle, trust investment officer of the complainant, a witness who, I think, was qualified to express his opinion as an expert, stated the situation very clearly in answer to a question as to whether the trusts created under the will could have been set up in cash. He said:
"The value of Keystone Watch Case Company stock in 1922, at the rate of $51 a share, would have realized for nine thousand eight hundred and twenty-three shares a total of $500,973, and that volume of stock could never have been negotiated for sale at the then current price of $51, it would have resulted in considerable negotiations at prices at least ten per cent. below that, and if calculated on the basis of $45 or $46 a share, there wouldn't have been enough for any more than Mrs. Zurbrugg's right under the will."
The willingness of Mrs. Zurbrugg, the widow, and of the Zurbrugg Memorial Hospital, chief beneficiaries under the will, to accept in lieu of cash certain securities as well as stock of the Keystone Watch Case Company at a value of 8100 per share, being the par value thereof and not the market value, brought about the execution of an agreement signed by substantially all the beneficiaries under the will. This agreement, signed in 1922, recites briefly the situation concerning the stock of the Watch Case Company and the willingness of Mrs. Zurbrugg to accept shares of that company in partial settlement of her legacy, and the purpose to make it unnecessary to sell any considerable number of shares of that stock in the open market; it further recites the willingness of the signers of that agreement to accept shares of stock in full payment and satisfaction of their respective legacies and bequests in accordance with the terms of an order made by the Burlington county orphans court based upon such consent. The agreement provides that the parties, *Page 607 
as fully as they had power and authority so to do, agreed that the said orphans court might apportion the shares of stock of the Watch Case Company, other than those shares apportioned to Mrs. Zurbrugg, to and among the various trusts created by the will for the use of the beneficiaries named therein. A petition for a decree of distribution was filed in the orphans court, and a decree was made by that court on July 17th, 1922, ordering the distribution of the corpus of the estate as shown by the account approved by that court on January 27th, 1922, and in accordance with that decree the executors proceeded to make distribution and to transfer the Watch Case Company stock allotted to the various trusts. The decree was full and complete and was carried out by the executors, and the remaining shares of stock of the Watch Case Company held by the executors were assigned by them to the several beneficiaries and to themselves as trustees for various trusts established under the will, and the record of all these transfers from the executors was shown on the books of the Watch Case Company. Accordingly, the various trusts provided under the will were set up on August 23d 1922.
The Mueller trust of $50,000 as then set up was represented by five hundred shares of the Watch Case Company stock then valued for that purpose at the par value of $100, and the other trusts provided under the will where the Watch Case Company stock constituted all or part thereof, were similarly treated with respect to that stock.
It is urged on the part of the defendant Mary A. Mueller, executrix of the will of John G. Mueller, deceased, and also on the part of Margaretta Rapp Englerth, that the shares of stock of the Watch Case Company used to set up the respective trusts by virtue of the decree of the orphans court and pursuant to the agreement presented to the court, should be considered as having been held by the trusts as of the date of death of the testator, and that the accumulations upon such stock over and above the dividends paid by the company to the executors during that period (1912 to 1922) should therefore be determined to be income payable to the life beneficiaries. At the final hearing of this case considerable testimony was received conditionally, over the objections of the *Page 608 
complainants' counsel as well as those of the counsel of the defendant Zurbrugg Memorial Hospital, tending to show that such accumulations were derived from profits not distributed. I have concluded that this testimony should not be considered because of the circumstances connected with the payment of the general legacies and the setting up of the trusts as a result of the decree of the orphans court. As has already been said, the will contemplates the setting up of various trusts in money, with the exception of the residue of the estate left to the Zurbrugg Hospital which authorized the setting aside of the Watch Case Company stock and the holding of the same by the trustees for the hospital for such time as they in their discretion might deem best.
The will gives wide discretion to the executors and trustees acting in their capacity either as executors or trustees so far as the handling of the stock of the Watch Case Company was concerned, and these life beneficiaries who are now taking the position that their trusts should be considered as established as of the date of death of the testator were benefited by accepting income paid to them during the interim between testator's death and the time the trusts were actually set up immediately following the decree of the orphans court. Because of the assent of Mrs. Zurbrugg, testator's widow, to the agreement, the executors were enabled to save to the life beneficiaries, as well as to the remaindermen, the benefits of the trusts provided in the will. Had the stock of the Watch Case Company been liquidated by placing the same on the market in order to pay the legacy of $250,000 to Mrs. Zurbrugg and to set up the trust of $250,000 for her benefit, both of which were preferred, the result would have been disastrous to the remaining beneficiaries including the Memorial Hospital as residuary legatee.
It must be conceded, I think, that the value of $100 per share of the Watch Case Company stock placed upon it by the terms of the agreement, as well as by the decree of the orphans court, must be taken as representing the value at that time for the purposes of this case, although it could not have been marketed for half that sum in cash despite a so-called book value of more than its par of $100. *Page 609 
All the parties to the agreement, as well as the executors, acted in good faith to bring about an equitable adjustment of a difficult situation. Mr. Mueller as well as Mrs. Englerth, who were life beneficiaries under two of these trusts, and signatories to the agreement, knew that they were benefiting by the generosity of Mrs. Zurbrugg and those who waived their prior rights under the will by joining in the agreement, thus avoiding the necessity of making a sale of this stock. They as well as the other beneficiaries acquiesced in the course taken by the executors with regard to this stock and in the delay of the distribution of the estate until after the execution of the agreement and the decree of the orphans court. Neither the remaindermen of these two trusts, nor others in the same class, were injured by reason of the trustees' having set up these trusts in stock of the Watch Case Company, because the will contemplates the payment to the remaindermen of the full amount of the principal of the trust in cash without regard to whether the securities in the trust either appreciated or depreciated during its continuance. It seems to me that the language of Vice-Ordinary Bigelow in the case of In re Ward, 121 N.J. Eq. 555; 192 Atl. Rep. 68; affirmed, 121 N.J. Eq. 606;191 Atl. Rep. 772, may well be applied to this case. He said (at p. 556):
"The bequest of `the sum of $60,000' is a pecuniary legacy which can be satisfied only by the payment of lawful money unless the legatee consents to accept securities. Halsted v. Meeker'sExecutors, 18 N.J. Eq. 136. Likewise with residuary gifts. `The general rule is that the residuary legatee has a right to insist that before the end of the first year after testator's death, the executors shall, if possible, convert all the assets into money, pay the debts, funeral and testamentary expenses, and hand over the clear residue to the residuary legatee. 2 Wms. Ex. *1454.
The legatee, residuary or other, may, however, in satisfaction of his legacy, consent to accept securities from the executors whether held by them for conversion under the general rule for settlement or under special directions of the will.' Macy v.Mercantile Trust Co., 68 N.J. Eq. 235. While a legatee who is beneficially entitled is responsible to no one if he consents to *Page 610 
accept securities, the rule is otherwise with a trustee. `The trustee has no right to accept, without inquiry as to the character and sufficiency of the alleged securities, anything but cash, unless under compulsion of a decree, or, in case of a testamentary trustee, because the assets in the hands of the executor were such as it was necessary or at least prudent so to do.'"
In re Brown, 112 N.J. Eq. 499; 164 Atl. Rep. 692,
Vice-Chancellor Fielder held that "if the trusts are set up in securities, the securities must be valued as of the date the trusts are established." These shares of stock did not become assets of the trusts until the trusts were set up under the decree of distribution, and they were evaluated at that time by virtue of the agreement. The transfer of the stock by the executors to the trustees took place in August of 1922 after the decree of distribution; prior to that time the dividends on the stock were collected by the executors and carried on their books as income of the estate. To all intents and purposes, taking over this stock for the respective trusts was analogous to a purchase for that purpose, and until that time the stock remained a part of the general estate upon which Mrs. Zurbrugg, as well as any other preferred legatees, had a prior claim. No decision was reached by the trustees to take over the Watch Case Company stock until the time the agreement was executed and the decree of distribution made, and it was undoubtedly the intention of the testator to have his executors and trustees exercise the widest discretion in connection with this stock because of his interest in the Watch Case Company and his desire to promote its best interests and preserve his estate from loss by reason of a premature or unfavorable sale of this stock. In the case of Inre Ward, supra, the court said with reference to the time of setting up certain trusts, "the presumption is that the several securities now found in the two trust funds became part of the trust and were accepted by the trustee for that purpose when the shares were actually transferred to the trust company as trustee. Or to state the converse, as long as the shares stood in the name of the decedent or his executor, they were presumably part of his general estate." *Page 611 
My conclusion is that the life beneficiaries are estopped from now claiming any so-called profits said to have accumulated upon the Watch Case Company stock prior to August 23d 1922, when the trusts were actually set up.
Another question to be determined relates to the apportionment by the trustees of certain moneys and stock received by the complainant trustee commencing in 1927 as a result of corporate changes in the Keystone Watch Case Company, the stock of which company was acquired by the trustees in August, 1922, when the trusts were set up. It is urged on the part of the executrix of John G. Mueller, deceased, and on behalf of Margaretta Rapp Englerth, that the allocation to corpus of certain moneys and stock as a result of certain corporate changes, which had their inception in 1927, concerning the Keystone Watch Case Company and two other corporations, one known as Keystone Watch Case Corporation (sometimes referred to as Corporation No. 2) and the other as Keystone Corporation (sometimes referred to as Corporation No. 3), was improper. The complainant seeks instructions as to the proper apportionment of the same.
This question, of course, relates to all the trusts which may be affected, including the Mueller and Englerth trusts. Under the provisions of the will the trustees were directed to pay to the life beneficiaries the net income, interests, issues and profits accruing from the principal of such trusts.
The Keystone Watch Case Company had extensive holdings in other companies which it operated in conjunction with its general business. It appears from the statement prepared by Dr. Moxey, a certified public accountant and a professor at the University of Pennsylvania who has been the auditor of the Watch Case Company and its successors since 1904, and from his testimony, that as of August 23d 1922, the issued capital stock of the company was $6,000,000; the surplus, $3,872,764.51, a total of $9,872,764.51, representing a book value of $164.56 per share; shortly prior to July 31st, 1927, when certain write-downs in the capital of the company were made, as hereinafter will appear, the total assets representing capital stock and surplus were $10,336,548.99, showing a book value of the capital stock on that date of $172.27 *Page 612 
per share, a difference of $7.72 per share between the date when the stock was taken into the trusts and certain write-downs which took place in July, 1927.
On the theory advanced by the counsel for Mueller and Englerth concerning certain undistributed profits, that sum per share should be considered as income, in the apportionment of the stock and money received by the trustee, brought about by the forming of the new corporation and the transfer of the business and property of the Keystone Watch Case Company to the Keystone Watch Case Corporation, its successor. These changes appear to have been brought about in the following manner: during the first six months' period of 1927, the directors and officers interested in the Keystone Watch Case Company determined upon the organization of a new corporation which was afterwards organized under the laws of the Commonwealth of Pennsylvania and known as the Keystone Watch Case Corporation, and in accordance with the action of the board of directors of the first named company, proceeded to make certain write-downs in its capital. These aggregated $3,915,261.77, of which $412,277.07 was charged against the contingent reserve for the Standard plant owned by the company, and the balance of $3,502,984.70 was charged to surplus. Portions of these write-downs were afterward recovered and restored to surplus of the successor company, so that only such write-downs as proved to have been justified in the light of experience were finally written off as losses. Dr. Moxey, who testified at some length concerning these write-downs, pointed out that the surplus and undivided profits had been overstated to the extent of the write-downs by reason of the fact that in the opinion of the board of directors of the Keystone Watch Case Company, it was intended to dispose of all their plants except the factory located in Riverside, New Jersey. In his testimony he stated that a write-down of assets due to depreciation of the value of those assets when the write-down takes place, does not represent a capital loss, and in further explanation thereof he said:
"I just wanted it definitely understood my answer which I gave a while ago as to capital includes the earnings of the company as well as the amount originally contributed by the *Page 613 
shareholders, so that the write-down of plant assets as a capital write-down subsequently turning out a capital loss in its entirety was not a write-down out of the capital stock nor could you say it was a write-down out of the earnings of the company. There is no possible way of segregating that write-down as between prior earnings and the original capital contributed by the company, although if we go back to any given period, let us say, 1912, the earnings accumulated from that time to the date of the write-down are looked upon as having been accumulated in excess of what those earnings actually were during that period. I don't want you to be confused, or anybody else, this was a write-down out of the capital stock, it is a write-down out of the capital, which consists of the capital stock, surplus and undivided profits, or any funded indebtedness which might exist."
It is contended that these write-downs were unjustified. After they were made, the total capital surplus of the Keystone Watch Case Company, according to the statement from the books, amounted to $6,421,387.22. It was testified by Dr. Moxey that if the Company had continued in existence there would have been a write-down of Standard plant assets irrespective of the formation of the new corporation; that it had been in contemplation for some time. The write-down was $420,000, the recovery $10,219.68, an absolute loss of $409,780.32. The Howard plant was sold at a loss of $88,271.27. It had been written down $95,107.55, and the write-down was only fifty per cent. of what it should have been. The write-down of $2,473,378.67 was recovered to the extent of $1,751,028.72, and the balance of $772,349.95 was an absolute loss. (The recoveries were made over a period of two and one-half years, during the remainder of 1927 and during the years 1928 and 1929.) To the extent, therefore, of $772,349.95, the write-down made July 31st, 1927, seems to be absolutely proper without taking into consideration the questions relating to the remainder of the write-downs made at that time, and would leave a total value of the assets as of July 31st, 1927, of $9,614,199.04, showing a book value of each share at $160.24, or $4.31 less than the book value of $164.55 as of August 23d 1922, the time of the transfer of *Page 614 
the stock to the trustee, which would show a loss, according to these figures, of $4.31 on each share of the corpus held by the trustee.
During the summer of 1927, effective on August 1st of that year, the assets of the Keystone Watch Case Company were transferred by sale, subject to liabilities, to the newly organized Keystone Watch Case Corporation whose officers and board of directors were the same as its predecessor. The sixty thousand shares of the old company then outstanding, par value $100 each, were exchanged for shares in the new corporation on the basis of one share of the old company for two shares of the new corporation, of which latter shares one was preferred stock, par value $50, and one share common stock without par value. The trustee duly received the stock to which it was entitled in place of the stock theretofore held by it, so that for all practical purposes it was no longer interested in the original corporation which eventually ceased to exist.
As a result of the action of the Watch Case Corporation in calling for redemption on November 1st, 1928, of fifty per cent. of its outstanding preferred stock at $51.25 per share, plus an amount equal to dividends at the rate of $3.50 per share per year from August 1st, 1928, to November 1st. 1928, the trustee subsequently received $51.25 per share which it credited to the principal of the trust and $.87 1/2 in dividends which it credited to income. Dr. Moxey's testimony was that no earnings were included in the payment of $51.25, the call price of the preferred stock, and the checks received by the trustee which were offered in evidence disclosed the method of payment and the fact that various certificates of stock were held in the name of Girard Trust Company, surviving trustee for the respective beneficiaries under the Zurbrugg will.
On February 1st, 1929, the remaining one-half of the preferred stock of the Watch Case Corporation was retired on the same basis and credited by the trustee to principal and income in like amounts as was the first payment. Dr. Moxey again testified that to the extent of $51.25 no earnings were included, and further that the cash necessary to retire the *Page 615 
preferred stock had become available by reason of the amounts raised by the liquidation of various plants and the sale of capital assets. After the retirement of the preferred stock of the Watch Case Corporation there remained in the hands of the trustee for the respective beneficiaries the common stock of the corporation.
The change which next followed concerning the Watch Case Corporation was explained by Dr. Moxey in his testimony as follows:
"The next change in capital structure occurred on or about August 1st, 1930, at which time there was organized another corporation, which has been designated in this case as Corporation No. 3, under the name of the Keystone Corporation, which, I think, was a Delaware corporation, and was organized for the purpose of acquiring from the Keystone Watch Case Corporation certain cash and other liquid assets, the capital stock of which was $1,500,000 divided into sixty thousand shares, par $25. At the time certain of the shares of the Keystone Watch Case Corporation were transferred to the Keystone Corporation there was distributed to the shareholders of the Keystone Watch Case Corporation in return, or in exchange for their shares of no par value in the Keystone Watch Case Corporation, one share of Keystone Corporation, par $25, and one share of common stock of the Keystone Watch Case Corporation, par value of $25."
Dr. Moxey further testified that no earnings were included in that exchange and that it represented a premium paid out of the capital surplus acquired by the Keystone Watch Case Corporation from the predecessor company.
Shortly afterward the Keystone Corporation was liquidated and there was received by its shareholders a cash distribution for their shares, consisting of two payments of $20 each per share. The distribution to the shareholders was made through Drexel and Company on behalf of Keystone Corporation which gave its check for $1,200,000 to Drexel and Company for that purpose. On July 1st, 1931, the Keystone Corporation paid to Drexel and Company the sum of $318,000 which was in final liquidation of its capital stock, and this amount was likewise distributed by Drexel and Company to *Page 616 
the shareholders at the rate of $5.30 per share. According to the testimony of Dr. Moxey this latter amount was a capital distribution with the exception of $.30 a share, and it further appears from his testimony that on February 29th, 1932, a distribution was made to the shareholders of the Keystone Watch Case Corporation of $5.00 per share, thus reducing the par value from $25 to $20, and that no earnings were included in that distribution. The next distribution took place under date of March 31st, 1933, when $3.33 1/3 per share was paid in reduction of the capital stock of the Keystone Watch Case Corporation from a par of $20 a share to a par of $16.66 2/3, which represents the present par value of the stock of that corporation, and in this latter payment there were no earnings included.
No charge of fraud or bad faith is made against the trustee in making the apportionments as a result of the various changes which took place in the capital stock of the Watch Case Company. In the case of Ballantine v. Young, 79 N.J. Eq. 70;81 Atl. Rep. 119, Vice-Chancellor Stevens, referring to the question of apportionment, said (at p. 75):
"I think, in the absence of fraud, or some very special circumstance, the apportionment should be made on the basis of the company's accounts. To apportion them according to the judgment of an expert or of the court as to whether the various items of disbursement are chargeable to current or capital, would be practically impossible. Proof on the one side would necessitate proof on the other. Even if the court, in the case of a foreign corporation, had power to compel exhibition of a multitude of items, stretching perhaps over a series of years, the length of time required for the examination, the expense of it, the doubt, after all, whether items, e.g., relating to the cost of new bridges, new rails, new machinery, new equipment, were properly chargeable to one account or the other, or if to both, in what proportion, would of themselves be prohibitive of the inquiry."
In the case of Hewitt v. Hewitt, 113 N.J. Eq. 299;166 Atl. Rep. 528, Vice-Chancellor Bigelow in his opinion stated that the books of the corporation should be accepted as presumably correct and refused to permit the beneficiaries to *Page 617 
question the action taken by the officers of the company, and reflected in their statement, in writing up the value of the mine and correspondingly increasing the surplus. In the case of CityBank Farmers Trust Co. v. McCarter, 111 N.J. Eq. 315;162 Atl. Rep. 274, the same vice-chancellor in his opinion said: "The action of the management of the company in respect to its books of account, is presumably correct," citing Ballantine v.Young, supra.
I have therefore concluded that the amount of income which should be credited to the life beneficiaries of the trusts in question is the sum of $.30 per share in addition to that already credited.
Another question to be determined is whether the children of John G. Mueller, deceased, are entitled to receive the sum of $50,000 in cash with interest from the date of his death on March 6th, 1934, because of their having entered into the litigation in this cause wherein the complainant trustee seeks a construction of the will and instructions relating to the matters to which reference has already been made. The thirty-third paragraph of the will, to which reference has heretofore been made, relates to the subject of the beneficiaries contesting the same and in that event annuls and revokes any bequest and devise therein made to such beneficiaries. It seems to me that the chief purpose of the filing of the bill in this cause was to determine for the benefit of the trustee whether or not it has properly apportioned the shares of stock and moneys which came into its hands as trustee under the various trusts set up under the will by stock of the Keystone Watch Case Company, and it was not in violation of the provisions of the will for the beneficiaries under the Mueller trust, the Englerth trust or the executrix of John G. Mueller, deceased, to have filed answers or counter-claims in this cause, because their effect was that of assisting in determining whether the trustee had made a proper accounting in the orphans court where exceptions had been taken to the trustee's account filed after the death of John G. Mueller.
Another question relates to a provision in the thirtieth paragraph of the will concerning payment to the ultimate beneficiaries of the several trusts, upon the termination of *Page 618 
the life estate, of the amount constituting the principal of such trusts in cash. The agreement executed by the parties in interest, which was followed by the decree of the orphans court, directing distribution of the estate, expressly provided that this paragraph of the will should not be affected, and, since counsel for the Zurbrugg Hospital, which would be called upon to make up any deficiency in the amount necessary to pay the children of John G. Mueller the full amount of the principal of such trusts, have conceded that the remaindermen are entitled to receive cash for the full amount plus interest, there appears to be no controversy thereon which affects the trustee; and I am in accord with this view, not only as relating to the Mueller trust, but also as to any other trust provided in the will which may be affected.
It seems to me that all the matters necessary to a final determination have been disposed of in these conclusions; however, if it should otherwise appear, any additional questions may be disposed of at the time the final decree is advised.
 *Page 1